Rivoli Theatre Company *v.* Allison, Appellant.

Argued April 29, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and McBRIDE, JJ.

344

*Harry C. Benton,* with him *Harold E. Miller,* and *Miller and Benton,* for appellant.

*Alexander A. Notopoulas,* with him *Martin Goodman,* for appellee.

Opinion by Mr. Justice Bok, June 30, 1959:

In 1927 three men—George Wilson, Sr., defendant, and Myer—formed a corporation to operate, among others, the Rivoli Theatre in Portage, Cambria County. Wilson died in 1937 and was succeeded by his son, who has also died. Defendant has at all times been Vice-President of the corporation and Manager of the theatre.

The suit was to recover $7053.16, with interest, representing concession money allegedly received and retained by defendant between 1946 and 1951. In 1954 a jury found in favor of defendant and a new trial was granted. In the instant trial a verdict in the total sum of $9498.14 was returned by the jury at the direction of the trial judge, who granted plaintiff's motion for a directed verdict on the ground that defendant admitted the case against him. A motion for a new trial was overruled and this appeal followed.

There are two grounds offered in support of the motion. First, the jury should have been allowed to pass upon the defense of ratification and estoppel. Second, the plaintiff's testimony, though uncontradicted by defendant, should have been submitted to the jury because of flaws between his testimony in chief and on cross-examination.

The basic law is clear. The Business Corporation Law of May 5, 1933, P. L. 364, Art. IV, §408; 15 P.S. §2852-408, provides: "Officers and directors shall be deemed to stand in a fiduciary relation to the corpo-

ration, and shall discharge the duties of their respective positions in good faith and with that diligence, care, and skill which ordinarily prudent men would exercise under similar circumstances in their personal business affairs."

Decisionally, the rule is well stated in *Howell v. McCloskey*, 375 Pa. 100, 99 A. 2d 610 (1953): "The rule of law is that officers and directors 'must act in the utmost good faith, and cannot deal with the funds and property of the corporation, nor utilize the influence and advantage of their offices, for any but the common interest . . . It is immaterial that their dealings may not have caused a loss or been harmful to the corporation; the test of liability is whether they have unjustly gained enrichment': Bailey v. Jacobs, 325 Pa. 187, 194, 189 A. 320. 'They must devote themselves to the corporate affairs with a view to promote the common interests and not their own, and they cannot, either directly or indirectly, utilize their position to obtain any personal profit or advantage other than that enjoyed also by their fellow shareholders . . . In short, there is demanded of the officer or director of a corporation that he furnish to it his undivided loyalty; if there is presented to him a business opportunity which is within the scope of its own activities and of present or potential advantage to it, the law will not permit him to seize the opportunity for himself . . .': Lutherland, Inc. v. Dahlen, 357 Pa. 143, 151, 53 A. 2d 143."

Defendant made contracts in his own name with various concerns for advertising film, candy, and popcorn. He relied on a conversation with Wilson, Sr., in 1928, when he said that Wilson left the matter of sideline concessions up to him. He accordingly pocketed the proceeds without ever mentioning it to Myer or bringing it before a meeting of the stockholders or directors of the corporation. Defendant admitted these

facts. It is therefore quite clear that he enriched himself at the corporation's expense.

Defendant's suggestion of ratification must fall. His single conversation with Wilson in 1928, before there were any concessions let, and Myer's possible suspicions when he went to the theatre and saw the vending machines fall far short of the full and frank disclosure to all of the stockholders required for ratification or estoppel by the *Lutherland* and *Bailey* cases. Further in *Weissman v. Weissman, Inc.*, 374 Pa. 470, 97 A. 2d 870 (1953), the corporation consisted of father, mother, and son, with mother inactive. The son acquired a mortgage for $600 of his own money on a property owned by the corporation and ultimately collected the full debt, with interest and costs, in the sum of $7700. His father knew all about the deal but his mother did not, and there was no evidence of corporate approval. This court reversed the verdict for the son.

Nor is there merit in defendant's contention that the jury should have passed on uncontradicted oral testimony, with especial reference to certain differences between Myer's testimony on direct and on cross-examination. He cites *Nanty-Glo Borough v. American Surety Co.*, 309 Pa. 236, 163 A. 523 (1932), but the case is not in point. It involved uncontradicted oral testimony, while the instant case involves admitted evidence and testimony, and there is a vast difference. Defendant's basic admissions left no issue for the jury to resolve, and there is no authority known to us that requires such an admission to run the gantlet in the jury room. It has, rather, the effect of an unintentional but still unconditional surrender.

The judgment is affirmed.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

In the year 1927, during that era when a motion picture theatre assured profits to its owners almost as certainly as a live oil well does today, three men in Blair County formed a corporation for the purpose of entering into the theatre business. Two of the men supplied the capital, the third man, Raymond R. Allison, (the defendant in this case), was to manage and operate the Rivoli Theatre in Portage which the corporation first rented and then purchased outrightly. The stock was divided equally between the three men. The moneyed men were George C. Wilson, Sr., who became president, and John Myer, who was designated treasurer. Allison was given the office of vice president. In 1937 George Wilson, Sr., died and John Myer advanced to the presidency of the corporation, George C. Wilson, Jr., became treasurer, and Allison remained vice president.

In 1930, Allison, in the spirit of profiting on the whims of patrons who like to masticate while following the adventures of their favorite cinema heroes and heroines, brought into the theatre a number of candy vending machines. Later, he gave additional comfort to his patrons by providing them with the means of chewing on popcorn. Allison retained in his own right the moneys obtained through the sale of the aforesaid candy and popcorn. Then, in 1945, he introduced commercial advertising on the screen through the medium of slides and short films proclaiming the alleged merits of commodities sold by merchants in the town. He also banked in his own name the returns from this additional accessorial enterprise.

In 1950 or 1951, when the ominous shadow of television competition began to fall across the box office of every theatre in the land, the president of the Rivoli Theatre Company, John Myer, cast a covetous eye on

the gains being pocketed by Allison from the candy, popcorn and commercial advertising concessions. An audit was made and it was revealed, which Allison did not dispute, that up to that time Allison had collected a total of $7,053.16 from the concessions. Mr. Myer requested Allison to turn over this sum to the corporation and Allison refused. A lawsuit in assumpsit followed and in the ensuing trial the Trial Judge directed a verdict in favor of the plaintiff in the sum of $7,053.16, plus interest. The defendant appealed.

At first glance it would seem that Allison's enrichment from his private commercialization of the theatre was legally reprehensible because no officer of a corporation may deal with funds or property of the corporation for his own exclusive benefit. In historical romances a D'Artagnon may proclaim the shibboleth of "All for one; and one for all!", but in the unemotional business corporation world, the only principle which governs is one for all.

Allison does not, and could not refute this fundamental principle of corporation law, but he builds his claim to the controverted $7,000 on the proposition that the other officers of the corporation knew what he was doing; and, not only did not object, but tacitly approved of the sidelines he was operating. He testified that as early as 1928 he discussed with the president, George C. Wilson, the subject of concessions and that Mr. Wilson authorized him to proceed with his private venture. "He told me he didn't want any parts of any concession business, because I was getting myself into a headache. He said if there is any chance for anybody to make any money, it is up to you. That is your affair and that was it."

Allison testified further that each Friday he would discuss corporate affairs with Wilson, who would then take up the matters with Mr. Myer who lived in the

same residential neighborhood, and that on the following Friday Wilson would report what Myer had said.

"Did you discuss business with Mr. Myer? Did you have occasion to discuss it with him? A. It was always Mr. Wilson. He would tell me when I would discuss various problems that I was confronted with and suggestions I would make, he said, 'Well, it is o.k. with me, but I think I will take it up with Mr. Myer and let you know next Friday.' That was always his reply. Q. Then he would let you know next week? A. He usually told me what Mr. Myer had to say the next Friday when he would come in."

Allison could well come to the conclusion after the concessions had been operating for a year or more that his fellow-corporation-officers were entirely satisfied with the understanding he had originally entered into with the president, Mr. Wilson. Especially could such a conclusion blossom on the plant of original understanding since Mr. Myer from time to time visited the theatre and saw the concessions in operation.

Mr. Myer admitted that he had discussed the concessions with Mr. Wilson prior to his death in 1937. Later he retracted this statement but did so in a manner which enveloped his whole testimony in such clouds of doubt and uncertainty that the jury might here fail to find reliability and see in the surrounding mist only incredibility. Myer said: "Q. You didn't give the year, Mr. Myer. You stated you first discussed it with George Wilson, Jr., after George Wilson, Sr.'s, death. A. I am really confused. I haven't been very well. Q. I understand. I don't want to confuse you. A. I should think that testimony was more accurate than now, possibly I had refreshed my memory a little bit on some things at the noon hour and it came back to me then. Q. You did say this morning you had discussed it with George C. Wilson, Sr., also? A. Yes, I must have been mis-

taken. This is off the record. Mr. Wilson, Sr., died in 1937, and so I must have been wrong this morning, because he died .then and I couldn't—Q. You were very definite this morning when you stated you had talked to Mr. Wilson, Sr.? A. Yes, I know. We often times get definite when we get mixed up."

The jury could also discard the possibility that both Wilson and Myer could visit the theatre and not see the concessions in operation. One might fail to miss the presence of a candy-eater but no one with his normal senses of sight, smell, and hearing could fail to detect the presence of the popcorn addict throwing the conspicuous and fragrant kernels into his mouth and noisily masticating them. Nor could one fail to see the commercial advertising tidbits on the screen. And, noting these money-making activities in their theatre, what would cause Wilson and Myer not to inquire as to why the returns from the concessions were not showing up in the theatre's receipts?

Is it possible that Allison's fellow-directors made no protest because they wished to see how the concessions turned out, prepared to disavow them if Allison sustained a personal loss, but eager to embrace them as a corporate enterprise if they made money? The whole concession-business was involved in so many inferences and counter-inferences that the Trial Court. was not justified in taking the case away from the jury on the assumption that the defendant had nothing to. say in his behalf.

If the jury found that the concessions were running for such a period of time that the corporation officials. could not help but know of their existence and still made no complaint about the proceeds failing to show up in the theatre's returns, the jury could have been warranted, added to what Allison testified to, in finding that the returns on the concessions came from an

independent investment by Allison, of which the corporation approved.

In the relationship between human beings there is no rule more logical and natural than the one which says that the person who allows an event, and especially a succession of events, to happen to his disadvantage and makes no complaint, will lose the right legally to complain when the rights of others have intervened.

The lower Court said that "Mr. Myer did know that candy was on sale at the theatre, but assumed that the proceeds were being paid into the corporation." But why should he rest on an assumption when the physical facts were at hand for him to see and observe? Why guess at the state of the weather when one can open the door and see?

The Trial Court said further: "Mr. Myer testified that Mr. Allison at no time ever told him about the concessions or that Mr. Allison was keeping the proceeds from them. Neither was it ever brought up or discussed at any Directors or Stockholders meeting. The Minute Book of the Corporation revealed that there had been 78 meetings of the Board of Directors from 1927 to 1951."

But if, over 78 meetings and scrutiny of the corporation books, no reference to the concessions appeared in them although the corporation officials knew of the concessions, their failure to call Allison to account could easily be construed as an acquiescence of Allison's personal retention of the concession returns. It would scarcely be reasonable to assume that business men would not note that anticipated returns were not being reported. The absence of an expected profit on a business sheet can be more conspicuous and alarming to a business man than a sudden abyss can be to a mountain climber.

It was for the jury to weigh all the evidence and determine whether there was an approval from the other two stockholders of the defendant's operations of his sidelines individually and not as a corporate enterprise. It would not be contrary to the evidence for the jury to conclude that Wilson had, in accordance with his usual custom, taken up the matter with Myer and that Myer must have approved the agreement since Wilson never reported back anything to the contrary. At any rate the silence of Mr. Myer could be interpreted as an approval or lack of approval. And with an even balance of probabilities, it is the fact-finding tribunal which should decide realities.

In *Balliet v. Brown*, 103 Pa. 546, 554, we said: "It is certainly true that the directors of a corporation have no right to sell or dispose of its movable property where this prevents the continuance of their business; such a sale made by them is void as against non-assenting stockholders. *But, if the stockholders are silent, make no objection whatever, by their acquiescence they will be taken as assenting.*" (Emphasis supplied.)

In *O'Neill v. Finnesey*, 299 Pa. 97, this Court said: " 'A strictly private corporation, owing no peculiar duties to the public, has the same dominion over and power to dispose of its property as an individual has' . . .; a corporation acts by its directors and, practically, for the purpose of binding it, they are the corporation . . .; and if ratification were needed, the silence and inaction of the company's officers and stockholders provided it . . . and; *when the stockholders are silent, make no objection whatever, by this acquiescence they will be taken as assenting.*" (Emphasis supplied.)

The Rivoli Theatre Company was strictly a private corporation, owing no particular duties to the public. Thus, its actions are controlled by the ordinary rules of interpretation of corporate conduct. The corpora-

tion could only act through its directors and there was evidence from which the jury could find that the directors authorized the defendant Allison to conduct the concessions as his own enterprise. And there was evidence from which the jury could find that, even though the concessions were not originally authorized as Allison's own private business, the directors later ratified Allison's actions after full knowledge of what had transpired. In either event the issue in the case, as I see it, was for the jury. Thus, I cannot agree with the Majority's views, and accordingly dissent.