Robinson, Appellant, *v.* Brier.

Argued April 25, 1963. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

*David N. Weiner,* with him *Robinson, Greenberg
and Lipman,* for appellants.

*Jack M. Cohen,* for appellant.

*Bernard M. Borish,* with him *Alan J. Davis, Morris
Wolf, Alfred W. Putnam,* and *Wolf, Block, Schorr and*

256

*Solis-Cohen,* and *Norris, Hart, Hepburn, Ross and Putnam,* for appellees.

OPINION BY MR. JUSTICE COHEN, October 9, 1963:

This is a derivative stockholder's suit to recover for the corporation profits made by a director of the corporation as a result of dealings with the corporation.[1] The equity court below denied relief and this appeal followed.

In 1957, appellants, Phillip and Harry Robinson, and appellee, Jack Brier, purchased all the stock of Leeds Travelwear Corporation (Leeds) and its various subsidiaries, including Mado Manufacturing Corporation (Mado). At this time, Brier was also the owner of Belber Trunk and Bag Company (Belber) and its subsidiary Saberly Products Corporation (Saberly).

Brier became one of the four directors of Mado whose function was to assemble and store the zippered soft luggage sold by Leeds. Since he had a great deal of experience in the luggage business, Brier was placed in charge of manufacturing, merchandising, and financial affairs. On assuming this position, Brier reviewed the prices that Mado was paying for materials with the aim of reducing the costs of Mado's manufacturing and assembling operations. Prices were obtained from competing suppliers and substantial savings were effected in the costs of cartons, plastics, and zippers. As part of this extensive review of the cost of supplies, Brier examined the schedule of prices being paid for the wooden frames used to give rigidity to the soft luggage bags. He went to Washington Woodcraft Corporation (Washington), the sole supplier of frames to Mado, and secured reductions on certain sized frames.

---

[1] Appellants originally sued also in their individual capacities. At oral argument, however, counsel stated that only the derivative action was being pressed.

At this time, Washington was the only known supplier of the type, quality, and quantity of wooden frames required by Mado.[2]

Brier considered the possibility of having Saberly manufacture the frames for Mado at prices substantially lower than those quoted by Washington. After making a cost analysis and determining that he could sell them at lower prices than Washington, Saberly began manufacturing frames for Mado. Mado purchased Saberly's entire output and bought the remainder of its requirements from Washington. Brier's interest in Saberly and Saberly's sales to Mado were common knowledge to all the directors of Mado, including appellant Phillip Robinson, and although Brier did not affirmatively state that he was making a profit, his dealings with Mado were transacted in an open manner and no attempt was ever made to conceal this fact.

Leeds, the parent corporation of Mado, prospered under Brier's management and in 1959 it went public and subsequently purchased the manufacturing assets and inventory of Saberly. In this action, appellants claim that Brier breached the fiduciary duty owed to Mado in permitting Saberly to sell frames to Mado at a profit. Appellants seek to recover these profits for the injured corporation. We conclude that the court below properly denied relief.

Appellants' first contention is that Brier usurped a corporate opportunity by permitting Saberly to manufacture the wooden frames instead of having Mado perform the work itself.

Where the corporation is *unable* to avail itself of the business opportunity, there can be no usurpation of a corporate opportunity. See *Johnston v. Greene,* 35 Del. Ch. 479, 121 A. 2d 919, 923 (1956) ; 3 Fletcher,

---

[2] Later, another manufacturer quoted prices to Mado, but its prices were higher than those of Washington.

Cyclopedia Corporations §862 (1947 rev. ed.).[3] The record in this case clearly supports the chancellor's finding that Mado was not in a position to manufacture wooden frames.

The record discloses that all of Mado's available space was being utilized for the assembling and storage of soft luggage. Moreover, since Mado was already behind in filling the orders of large customers such as Sears-Roebuck and Macy, any allocation of space to frame manufacturing would have resulted in a further delay in production. Because of the pressure of back orders and this critical space situation, it was correctly decided that Mado should devote its energies to assembling and storing luggage instead of becoming involved in the manufacture of wooden frames. As the chancellor concluded: "Mado had a critical space problem. Its business was basically making luggage and it had no woodworking experience. Its operations were divided between two buildings which did not lend itself to producing frames. Frame handling would have been a big problem. The luggage was light and bulky; they were congested and were utilizing all their available space." Accordingly, there was no usurpation of a corporate opportunity.

Appellants next contend that Brier breached his fiduciary duty by selling the wooden frames to Mado without (1) explicitly stating that he was making a profit and (2) without revealing the amount of the profit.

Transactions between a corporation and its directors are not prohibited but rather are governed by a strict standard of "fairness." See 3 Fletcher, Cyclopedia Corporations §931 (1947 rev. ed.); Fleur, Per-

---

[3] The parties agree that since the corporations involved are Delaware corporations, Delaware law governs this controversy. On the questions raised, however, there would seem to be no significant difference between Delaware and Pennsylvania law.

sonal Liabilities of Corporate Officers and Directors, 35-49 (Prentice Hall 1961); Notes, 61 Harv. L. Rev. 335 (1948). While the interested director has the heavy burden of demonstrating the fairness of the transaction, *Keenan v. Eshleman,* 23 Del. Ch. 234, 2 A. 2d 904, 908 (1938), we conclude that Brier has satisfactorily sustained that burden under the facts presented in this case.[4]

The record discloses that Brier made diligent efforts to locate the lowest source of frames and that Saberly's prices were below those of any other competitor, thereby resulting in substantial savings to Mado;[5] that Brier's dealings with Mado were open and scrupulously honest, with Brier never representing that he was not making a profit;[6] and that Braverman,

---

[4] The law in this area is summed up in an excellent article written by Professor Stanley A. Kaplan where the author states: "Probably the larger number of modern courts and the better rule would hold that the contract would be presumed unfair unless the burden of proving its fairness is sustained by those who would uphold the transaction. The courts have generally accepted the fact that in our modern economic system, close interrelationships exist between many corporations in similar fields and that many persons will hold legitimate financial interests and directorates in various operations; consequently interlocks are not prohibited and multiple directorates are not forbidden, but a control device is applied in which the ultimate criterion is the fairness of the transaction." Kaplan, Conflict of Interest in Corporations, 17 University of Chicago Law School Conference Series 34, 39-40 (1961). See discussion, *Pepper v. Litton,* 308 U.S. 295, 306-307 (1939).

[5] Appellants question the finding of the court below that Mado saved approximately $69,000 due to Saberly's manufacture of the frames. This figure includes Washington's reduction in prices because of the competition from Saberly. Since Mado's savings were $24,000—a considerable financial benefit—even without including the reductions from Washington, we need not rule on whether these reductions should have been included.

[6] In the court below, appellants argued that Brier had deceived them by stating that he was not making any profit on the frames.

a non-interested director, testified that he expected Brier to make a profit. These circumstances indicate that Brier's dealings with Mado were eminently fair and we conclude that he was entitled to retain any profits resulting therefrom.[7]

The mere fact that Brier did not affirmatively state that he was making a profit did not render the dealings unfair. The other directors as reasonable businessmen should have known and, indeed, must have been aware, as Braverman was, that Brier would not invest capital and energy into a venture from which he did not expect to profit. Businessmen engage in business to earn a profit and do not, except in rare instances, offer their services gratuitously. Furthermore, the directors authorized the sale of hard luggage to Leeds from Brier's company Belber, the parent corporation of Saberly, at a 25% gross profit—approximately the same profit that Saberly earned on the transactions in question.[8] These other dealings should also have put the directors on notice that the business Brier transacted with Mado would likewise be on a profit basis. Since the directors should have known that Brier was making a profit on the sale of wooden

Brier denied this charge and the chancellor, as the trier of facts, resolved this factual dispute in favor of Brier.

[7] Mado's articles of incorporation authorize dealings between the corporation and "interested directors." Such a provision does not prevent judicial inquiry into the fairness of the transaction. Cf. *Sterling v. Mayflower Hotel Corporation*, 33 Del. Ch. 293, 93 A. 2d 107 (1952).

[8] On the question of the amount of Saberly's profits, appellants assert that the court below improperly excluded from evidence statements concerning the net profits of Belber. The statements consisted of the *combined* earnings from all of Belber's activities, including its hard luggage business. Since the issue before the lower court was limited to profits derived from Saberly's frame sales, the evidence of Belber's gross sales was irrelevant and hence properly excluded.

frames to Mado, Brier was under no duty to explicitly state this fact.[9]

Appellants also assert that Brier had a duty to disclose not only that he was earning a profit, but to reveal the amount of profit including all pertinent financial details. We cannot accept this position. Having charged Mado a price substantially lower than that quoted by others, and having revealed his interest in the transactions, it was not necessary for Brier to state the amount of profit he was earning. Those figures were of no consequence to Mado since it was receiving the benefit of a very reasonable bargain—a much better one than was being offered by strangers.[10] If appellants' theory were to prevail, corporations would be deprived of the goods and services of highly competent individuals and organizations because of the natural unwillingness of businessmen to reveal the financial details of their business affairs. According to appellants' position, for example, a director who also served as corporate counsel would have to calculate and disclose his net profit on corporate legal matters including a breakdown for office rent, secretaries' salaries, office supplies, etc. Under such a rule, corporations would be denied access to goods and services and able men would be deterred from accepting direc-

---

[9] Appellant Harry Robinson, who was not a director of Mado, argues that the knowledge of the directors is not imputable to him as a stockholder. In judging the validity of the transactions in question, we are concerned with whether Brier, the interested director, dealt fairly with the non-interested directors. Having decided that the strict standard of fairness has been met, we do not reach the question of possible ratification by the stockholders, a determination in which the knowledge of the stockholders would be relevant.

[10] In fact, Saberly's cost sheets were made available to Mado's purchasing agent. He could have computed Saberly's gross profit by subtracting from the prices charged to Mado the production costs of the various frames.

torships on corporations with which they might have occasion to deal. We therefore hold that Brier was under no duty to reveal the financial details of his dealings with Mado.

Decree affirmed at appellants' cost.