520 A.2d 469

**CST, INC.**

v.

**Irving W. MARK and Gerald Mark and Irving W. Mark & Associates.**

**Appeal of Irving W. MARK and Irving W. Mark & Associates.**

Superior Court of Pennsylvania.

Argued Oct. 21, 1986.

Filed Jan. 27, 1987.

304

Martin Techner, Philadelphia, for appellants.

Before WIEAND, OLSZEWSKI and CERCONE, JJ.

WIEAND, Judge:

In this dispute between a corporate advertising agency and its vice president, the trial court, sitting without a jury, found that the corporate officer had violated a duty of undivided loyalty to the corporation by seizing a business opportunity for himself and, therefore, awarded damages to the corporation in the amount of forty thousand ($40,000.00) dollars. The court also found that the corporation was indebted to its officer for services rendered in the amount of $29,931.46. A motion for post-trial relief by the corporate vice president was denied by the court, and judgments were entered on the findings of the trial court. In this appeal by the corporate vice president, he contends that the trial court erred when it (1) found that he had seized a corporate opportunity for himself; (2) found that he had caused a loss to the corporation; and (3) calculated the amount which he was owed for services rendered and work performed. We disagree and affirm.

CST, Inc. is a Pennsylvania corporation engaged in the business of advertising, with its principal place of business in Devon, Chester County. Irving W. Mark is a specialist in the field of negotiating and preparing ads for insertion in newspapers. He conducted this business under the name of Irving W. Mark & Associates. On October 23, 1978, CST and Irving W. Mark & Associates entered an agreement by the terms of which Irving W. Mark & Associates was to negotiate and prepare all media insertions for CST's clients on a commission basis. The agreement was to continue for a period of one year. On June 25, 1979, Mark agreed to

become an employee of CST and was appointed Vice President of Media Operations, at an annual salary of $30,000.00, but with an increase in salary to $36,000.00, effective January 1, 1980. Mark's duties as a vice president were essentially the same as they had been under the earlier agreement between CST and Irving W. Mark & Associates.

In early 1980, Mark was put in charge of an advertising project which CST was handling for the Commonwealth of Virginia. This project involved the preparation of a 1981 Trip Planning Guide which was to be distributed to the general public as an advertising supplement in various newspapers along the east coast. The project was completed successfully and resulted in substantial profits to CST. After this, CST expected to be designated by Stuart Ford, Inc., the advertising agent for the Commonwealth of Virginia, as the agency to prepare a Trip Planning Guide for 1982. With this purpose in mind, Mark contacted Stuart Ford and the Virginia State Travel Service in July, 1981. He was informed that whoever published the 1982 guide would be required to put up front an amount between $5,000.00 and $10,000.00 to compensate sales personnel who would be employed to sell advertising for the guide.[1]

During July and August, 1981, Mark reported to Robert Chapin, the president of CST, that this money had to be advanced and that it was a prerequisite to CST's obtaining the job of preparing the 1982 trip guide. Chapin procrastinated and did not commit himself regarding the necessary advance of funds. The trial court found also that CST had been having cash flow problems at this time. When Stuart Ford, the Virginia advertising agency, began to put pressure on Mark to obtain a definite commitment from CST regarding its willingness to advance the necessary funds and accept the project, Chapin continued to be noncommital. Finally, sometime between August 8 and August 13, Mark travelled to Virginia, where he told Stuart Ford that CST had not agreed to come up with the front money but that he

---

1. Stuart Ford, Inc. had "fronted" this money the prior year, but refused to do so in 1982.

would do so and would take the advertising job in the name of Irving W. Mark & Associates. Mark testified that he did this despite the fact that no one at CST had told him that CST was no longer interested in the project or that it would not advance the necessary funds. Mark also testified that before accepting the project for himself, he had told Chapin and other top level employees at CST that he would be willing to advance the sales money and accept the project on behalf of his own company if CST were unwilling to meet the conditions imposed by the Commonwealth of Virginia. However, he did not inform Chapin when he decided to pursue the project himself, and CST did not consent to his accepting the job for his own account.

On October 15, 1981, CST offered to raise Mark's salary even though, as the trial court found, CST was then aware that Mark had taken the Virginia project on behalf of his own company. One month later, Chapin told Mark that CST was in financial trouble. Thereafter, Charles Rhodes, another officer of CST, travelled to Virginia on behalf of CST and discussed the 1982 travel guide project with officials of the Virginia State Travel Service. As a result of this meeting, Stuart Ford, Inc. requested Mark to execute a release of his rights to the project. Mark complied with this request, and CST was offered the job. By that time, however, the Commonwealth of Virginia also required the posting of a $100,000.00 performance bond. CST was unable to post the necessary bond, and the 1982 guide was not published. On November 19, 1981, Mark was discharged by CST. By the end of 1981, CST had ceased doing business.

■ "Officers and directors ... stand in a fiduciary relation to the corporation, and [must] discharge the duties of their respective positions in good faith...." Act of May 5, 1933, P.L. 364, § 408, 15 P.S. § 1408, as amended.

" * * * [Officers and directors] must devote themselves to the corporate affairs with a view to promote the common interests and not their own, and they cannot, either directly or indirectly, utilize their position to obtain any personal profit or advantage other than that enjoyed

also by their fellow shareholders: *Bird Coal and Iron Co. v. Humes,* 157 Pa. 278, 287, 27 A. 750, 752 [ (1893) ]; *Porter v. Healy,* 244 Pa. 427, 435, 436, 91 A. 428, 431 [ (1914) ]. In short, there is demanded of the officer or director of a corporation that he furnish to it his undivided loyalty; if there is presented to him a business opportunity which is within the scope of its own activities and of present or potential advantage to it, the law will not permit him to seize the opportunity for himself. . . . *Bailey v. Jacobs,* 325 Pa. 187, 194, 189 A. 320, 324 [ (1937) ]."

*Seaboard Industries, Inc. v. Monaco,* 442 Pa. 256, 261–262, 276 A.2d 305, 309 (1971), quoting *Lutherland, Inc. v. Dahlen,* 357 Pa. 143, 151, 53 A.2d 143, 147 (1947). See: *Hill v. Hill,* 279 Pa.Super. 154, 160–161, 420 A.2d 1078, 1081 (1980). Where, however, the corporation is unable to avail itself of a business opportunity, an officer or director may accept the same for his or her own benefit. See: *Robinson v. Brier,* 412 Pa. 255, 257, 194 A.2d 204, 206 (1963). Also, "an officer or director may seize a corporate opportunity if the same is made known to the shareholders, who consent to the acquisition of the opportunity by the individual officer or director instead of the corporation, and such action is not detrimental to the creditors of the corporation." *Hill v. Hill, supra,* 279 Pa.Super. at 163, 420 A.2d at 1082, citing *Stony Brook Lumber Co. v. Blackman,* 286 Pa. 305, 309, 133 A. 556, 557 (1926).

■ Whether a business opportunity is a "corporate" opportunity is a question of fact to be determined from the circumstances existing at the time when it arose. See: *Borden v. Sinskey,* 530 F.2d 478, 490 (3d Cir.1976); 18B Am.Jur.2d *Corporations* § 1792, at 644 (1985). In the case sub judice, the evidence was sufficient to support the trial court's finding that the preparation of the 1982 Trip Planning Guide was a corporate, business opportunity. Mark does not contest this finding. He argues, however, that he was able to undertake the project himself after it became apparent that CST was unwilling and/or unable to commit

itself by advancing the funds required by the Commonwealth of Virginia.

■ There is evidence to support the trial court's finding that CST did not refuse to advance the money demanded by the Commonwealth of Virginia or discontinue its interest in obtaining a contract to create the Trip Planning Guide. Its hesitation about agreeing to the conditions imposed by Virginia, even if frustrating to Mark, who was on the firing line, did not entitle Mark to discontinue his efforts on behalf of his employer and seize the opportunity for himself. The trial court found, and the evidence supports, that Mark neither sought nor received permission from CST to accept the business opportunity for himself.

■ Mark also contends that CST was financially unable to advance the monies necessary to hire the sales people and, therefore, could not have accepted the contract. Because of this financial inability, Mark argues, the project ceased to be a corporate opportunity and could properly be accepted by him for his personal benefit. We cannot agree.

[F]inancial inability of a corporation to take advantage of a corporate opportunity is a defense for corporate officers or directors charged with liability for taking an opportunity. It has been said, however, that such financial inability must amount to insolvency to the point where the corporation is practically defunct. Mere technical insolvency, such as inability to pay current bills when due or mere inability to secure credit, will not suffice. The corporation must be actually insolvent.

18B Am.Jur.2d *Corporations* § 1790, at 642–643 (1985) (footnotes omitted). See: 8A P.L.E. *Corporations* § 275, at 397 (1971); Annotation, *Financial Inability of Corporation to Take Advantage of Business Opportunity as Affecting Determination of Whether "Corporate Opportunity" was Presented,* 16 A.L.R.4th 185, § 4[b] (1982). See also: *Hill v. Hill, supra,* 279 Pa.Super. at 162, 420 A.2d at 1082, citing *Robinson v. Brier, supra.* The evidence in this case showed only that CST was having cash flow problems at the time when Mark seized the Virginia project for

himself. There was no evidence that CST was near insolvency or that it could not have produced the funds necessary to secure the project. Thus, the record does not permit a reviewing court to conclude that the trial court erred by finding that Mark had seized a corporate opportunity when he secured the Virginia project for his own company.

As a general rule, "the conduct forbidden in the acquisition of interests adverse to the corporation is the realization of a profit." *Weissman v. A. Weissman, Inc.,* 382 Pa. 189, 193, 114 A.2d 797, 799 (1955). Thus, "the test of [the officer's] liability is whether he has unjustly gained enrichment." *Id.* (emphasis deleted). See: *Seaboard Industries, Inc. v. Monaco, supra; Rivoli Theatre Co. v. Allison,* 396 Pa. 343, 152 A.2d 449 (1959); *Howell v. McCloskey,* 375 Pa. 100, 99 A.2d 610 (1953); *Lutherland, Inc. v. Dahlen, supra; Bailey v. Jacobs, supra; Hill v. Hill, supra.* In the instant case, the trial court found that Mark had not been unjustly enriched by the transaction. Not only had he released any interest he might have had in a contract to perform the project, but the evidence showed that Mark, in fact, had lost more than $5,000.00 of his own money in the transaction.

The court found, however, that Mark's breach of the fiduciary duty owed to his corporate employer had been a substantial factor in bringing about and, therefore, a legal cause of the corporation's failure to get the contract. On this basis, the court made an award of damages measured by the court's estimate of the profits which the corporation had lost by not getting the job. This was in accord with existing law. See: *Hill v. Hill, supra* (directors of corporation may be held liable for any losses sustained by corporation caused by breach of fiduciary obligation); *Boyd v. Cooper,* 269 Pa.Super. 594, 597, 410 A.2d 860, 861 (1979) ("[w]here an officer or director acquires information in confidence and adopts or uses it for his own private benefit to the exclusion and detriment of the corporation, ... he may be subject to liability for damages sustained as a result

of such breach of his fiduciary duties."). Cf. *Howell v. McCloskey, supra* (officer and director of corporation did not breach fiduciary obligation by acquiring outstanding shares of corporations stock where there was no existing resolution of the corporation concerning the outstanding shares, no detriment to the corporation and no unjust enrichment).

Appellant contends that the evidence was insufficient to support the trial court's findings (1) that CST's profits would have been $40,000.00 and (2) that his conduct was the legal cause of CST's failure to obtain the contract. These are close questions. However, "[w]hen a Pennsylvania appellate court reviews determinations of questions of fact, its only function is to examine and ascertain whether there is competent evidence in the record from which the facts necessary to sustain the judgment might properly be found.... The test is not what conclusion the appellate court would have reached if it had been its province to find the facts, but whether there was evidence from which the facts could reasonably be found." 16 Standard Pa.Practice 2d § 91:113 (1983) (footnotes omitted). See: *Commonwealth ex rel. Gibson v. DiGiacinto,* 497 Pa. 66, 70, 439 A.2d 105, 107 (1981); *Delahanty v. First Pennsylvania Bank,* 318 Pa.Super. 90, 113–114, 464 A.2d 1243, 1255 (1983); *Stowe v. Booker,* 284 Pa.Super. 53, 57, 424 A.2d 1388, 1390 (1981).

■ Because our scope of review is thus limited, we are constrained to accept the findings of the trial court. Although, the evidence would have supported contrary findings, we cannot say that the trial court arbitrarily rejected evidence or abused its discretion when it concluded that except for appellant's breach of the duty of undivided loyalty to the corporation, CST would have been hired to produce the Virginia Trip Planning Guide and would have realized therefrom a profit of $40,000.00.

■ Finally, it is contended that the trial court erred when it found that CST owed Irving W. Mark & Associates only $29,931.46 and not $175,717.23, as claimed, for services

rendered. The trial court found that CST owed Mark & Associates the sum of $883.95 as the balance remaining due under an agreement reached by the parties in December 1979, as well as $29,047.51, which was represented by an invoice which Mark presented to CST in December, 1979. Although Mark & Associates contended at trial that they were owed $175,717.23, the trial court found that such an indebtedness had not been proven. We have reviewed the record and find no reason to disturb the trial court's findings with regard to this claim.

Affirmed.