In re SPECIALTY PLASTICS,
INC., Debtor.

The COMMITTEE OF UNSECURED
CREDITORS OF SPECIALTY
PLASTICS, INC., Plaintiff,

v.

Eugene L. DOEMLING and Regina A.
Doemling, a partnership t/d/b/a
Walnut Street Properties, Defendants.

In re Eugene L. DOEMLING, t/a Wal-
nut Street Properties, and Regina A.
Doemling, his wife, Debtors.

The COMMITTEE OF UNSECURED
CREDITORS OF SPECIALTY
PLASTICS, INC., Plaintiff,

v.

Eugene L. DOEMLING and Regina A.
Doemling, as individuals and as part-
ners t/d/b/a Walnut Street Properties,
Defendants.

Bankruptcy Nos. 82–3833, 88–2103.
Adv. Nos. 84–0216, 88–0502.

United States Bankruptcy Court,
W.D. Pennsylvania.

May 3, 1990.

See also, D.C., 85 B.R. 32.

Bernhard Schaffler, Schaffler & Bohm, Pittsburgh, Pa., for defendants.

Charles E. Bobinis, Bernstein and Bernstein, P.C., Pittsburgh, Pa., for plaintiff.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the Court is a Complaint filed at Adversary No. 84–216 by The Committee of Unsecured Creditors of Specialty Plastics, Inc. ("Committee") to recover damages for usurped corporate business opportunities belonging to Specialty Plastics, Inc. ("Specialty"), to set aside fraudulent transfers, and to avoid preferential transfers.

The Committee has brought an action at Adversary No. 88–502 objecting to the discharge of Debtors Eugene L. Doemling and Regina A. Doemling, his wife, and objecting to discharge of the debt arising out of Adversary No. 84–216.

Judgment will be entered in Adversary No. 84–216 for the Committee and against Eugene Doemling in the amount of $170,631.00. Judgment will also be entered in that adversary action for Regina Doemling and against the Committee.

Judgment will be entered in Adversary No. 88–502 for the Committee and against Eugene L. Doemling. The debt arising out of Adversary No. 84–216 will be declared nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

I

A) *Adversary No. 84–216*

The Amended Complaint in Adversary No. 84–216 consists of nine (9) counts.

The Committee alleges in Counts I, III and V that Eugene and Regina Doemling usurped corporate business opportunities belonging to Specialty when they purchased a B75, a B100, and a Uniloy 300 blow molder machine, respectively.

Counts II, IV and VI are brought as alternatives to Counts I, III and V. The Committee alleges that the purchase and subsequent sale of these machines by the Doemlings constituted fraudulent transfers under 11 U.S.C. § 548(a). The Committee seeks to avoid these transfers and to recover their value for Specialty's bankruptcy estate.

The Committee further alleges in Counts VII–IX that the payment of certain debts by Specialty constituted preferential transfers pursuant to 11 U.S.C. § 547(b). Count VII seeks to avoid the alleged payment by Specialty to Eugene Doemling of $2,000.00 in partial satisfaction of a note. Count VIII seeks to avoid the alleged payment by Specialty to Mellon Bank of $13,000.00 on a debt which Eugene Doemling had guaranteed. Count IX seeks to avoid the alleged payment by Specialty of $13,540.00 in overdue rentals to Walnut Street Properties, Inc., a purported partnership consisting of Eugene and Regina Doemling.

B) *Adversary No. 88–502*

The Complaint in Adversary No. 88–502 consists of two (2) Counts.

The Committee seeks in Count I to have any debt arising from a judgment in its favor at Adversary 84–216 declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2), (4), or (6).

Alternatively, the Committee seeks in Count II to have the Doemlings denied a discharge pursuant to 11 U.S.C. § 727(a)(2), (3), or (4) in their own bankruptcy case at Bankruptcy No. 88–2103.

## II

## FACTS

Specialty was incorporated in 1975 by Eugene Doemling because another business which he owned, Imaging Systems Corp., needed a reliable source of plastic containers. Mr. Doemling was the sole shareholder of Specialty and a member of its Board of Directors from its inception, and was its president when it filed for bankruptcy on December 3, 1982.

Early in 1981, Eugene Doemling purchased a B75 and a B100 blow molder and related equipment for a total of $34,500.00. His acquisition of these two (2) machines, for himself, was never formally approved by Specialty's directors.

On February 25, 1981, Eugene Doemling leased these two blow molders and related equipment to Specialty. The term of the lease was from March 1, 1981 to May 31, 1986. Monthly rental payments for each machine was $600.00—i.e., totaled $1,200.00.

These two machines were installed, maintained, and repaired by Specialty at a total cost to it of $23,331.00.

In June of 1982, Eugene Doemling purchased a Uniloy 300 blow molder and related equipment for $65,000.00. His acquisition of this machine, for himself, was not approved by Specialty's board of directors.

On July 1, 1982, Eugene Doemling leased the Uniloy 300 and related equipment to Specialty. The term of the lease was from July 1, 1982 to June 30, 1987. Monthly rental payments were $1,500.00

In December of 1982, immediately prior to Specialty's bankruptcy petition, Eugene Doemling unilaterally terminated Specialty's leasing of the B100 and sold it to a third party for $65,000.00. Specialty had paid a total of $7,800.00 in rental payments for the B100.

That same month, Eugene Doemling unilaterally terminated Specialty's leasing of the Uniloy 300 and sold it to a third party for $72,500.00, thereby realizing a gain of $7,500.00 on the sale. Specialty had paid $7,500.00 in rental payments for the Uniloy 300.

On May 1, 1984, Eugene Doemling unilaterally terminated Specialty's leasing of the B75 and sold it for $85,000.00. Specialty had paid $9,000.00 in rental payments for the B75.

All told, Specialty paid Eugene Doemling $24,300.00 in rental payments for these three (3) machines and related equipment ($7,800.00 + $7,500.00 + $9,000.00 = $24,300.00).

On December 3, 1982, Specialty filed a voluntary Chapter 11 petition in this Court. Shortly thereafter, Eugene Doemling filed several proofs of claim against Specialty. For instance, on April 5, 1983, he filed a claim for $419,506.70 for loans purportedly made to Specialty between February 9, 1977 and September 13, 1982.

Eugene Doemling caused only two (2) balance sheets for Specialty to be prepared. They are inconsistent concerning the purported loan.

The balance sheet dated October 31, 1982 does *not* indicate any loan by Eugene Doemling to Specialty. Rather, the money in question is categorized as paid-in capital. According to this balance sheet, Specialty was solvent and had paid-in capital of $440,894.70, assets of $411,612.55, and liabilities of $245,000.00.

The balance sheet dated November 30, 1982, prepared only one (1) month after its predecessor and approximately four (4) days prior to Specialty's bankruptcy petition, paints an altogether different picture. It shows a loan by Doemling of $354,894.70, paid-in capital of only $86,000.00, assets of $355,799.39, and liabilities totaling $586,902.77.

Prior to Specialty's bankruptcy petition and at all times relevant, every time Doemling made money available for Specialty, he instructed its bookkeeper to record the transfers on a separate sheet in the back of Specialty's ledger book. Doemling did not designate the money as an account payable.

Several of the promissory notes dated between April through September of 1982,

which provide a substantial portion of the proof of claim in question, were not executed until November of 1982, less than one (1) month prior to Specialty's bankruptcy filing. In addition, there is no indication that these purported loans were ever approved by Specialty's board of directors. The minutes of meetings of Specialty's board of directors contain no reference to any loans from Doemling to Specialty. Moreover, Doemling, himself, could not recall whether the purported loans had ever been discussed by Specialty's board.

The Statement of Financial Affairs and the various schedules filed by Specialty in connection with its bankruptcy petition were signed by Eugene Doemling in his capacity as president of Specialty. The purported loans are not listed on any of the schedules. In addition, they listed Regina Doemling as treasurer of Specialty.

On August 9, 1988, Eugene and Regina Doemling filed a voluntary Chapter 11 petition in this Court at Bankruptcy No. 88–2103.

### III

### ADVERSARY NO. 84–216

#### A) *Usurpation of Corporate Business Opportunities*

The Committee alleges in Counts I, III, and V that the Doemlings usurped a business opportunity belonging to Specialty when they purchased, for themselves, leased to Specialty, and then sold to third parties the B75, B100, and Uniloy 300 blow molders and related equipment.

As has been noted, Eugene Doemling was at all relevant times the sole shareholder and a director of Specialty.

The sole evidence of record that Regina Doemling was ever an officer of Specialty is contained in the schedules and statements submitted by Eugene Doemling in his capacity as president of Specialty in connection with its Chapter 11 petition, wherein she is listed as treasurer of Specialty.

The overwhelming weight of the credible evidence, however, is to the contrary. Regina Doemling was never an officer of Specialty.

According to the by-laws of Specialty, the treasurer had to carry out certain duties. For instance, the treasurer was responsible for depositing all monies and other valuables belongs to Specialty; for disbursing funds of the corporation as may be required for it to properly conduct its business; and, for rendering to the directors and its president an accounting of all financial transactions of the corporation.

There is no evidence that Regina Doemling ever performed any of these duties. She was never involved in depositing monies or other valuables of the corporation and played no part in disbursing funds of the corporation. Specialty's bookkeeper drew all checks issued by Specialty and was told by its president to whom checks were to be issued. Once they were drawn, the checks were signed by Specialty's president. Regina Doemling never rendered an accounting to Specialty's directors or president.

Furthermore, Regina Doemling never came to Specialty's place of business in order to perform work for it. She never dictated any letters or handled its mail. No checks for wages or salary made payable to her were ever issued by Specialty. She was not listed as an employee of Specialty on any tax records maintained by the corporation.

■ Eugene Doemling, by virtue of his position as a director of Specialty at the relevant times, stood in a fiduciary relationship to the corporation. As such, he was required to discharge the duties of his position in good faith. *See* 15 P.S. § 1408 (Purdon's 1967).

■ As a general matter, officers and directors must devote themselves to the affairs of the corporation with a view to promoting the corporation's interests rather than their own. They may not utilize, either directly or indirectly, their positions in the corporation to obtain any personal profit or advantage beyond that enjoyed by shareholders. *See Bird Coal and Iron Co. v. Humes*, 157 Pa. 278, 27 A. 750, 752

(1893); *also, Porter v. Healy,* 244 Pa. 427, 91 A. 428, 431 (1914). In other words, an officer or director is required to provide it his undivided loyalty. If a business opportunity which lies within the scope of the corporation's business activities and which is of potential advantage to it is presented, an officer is not permitted to avail himself of that opportunity and to seize it for himself. *See Bailey v. Jacobs,* 325 Pa. 187, 189 A. 320, 324 (1937). This principle applies to close corporations. *See Seaboard Industries, Inc. v. Monaco,* 442 Pa. 256, 276 A.2d 305, 309 (1971).

■ There is no bright line test for determining whether a particular business opportunity is a "corporate" opportunity. It is a question of fact to be determined from the totality of the circumstances existing at the time when it arose. *See Borden v. Sinskey,* 530 F.2d 478, 490 (3rd Cir.1976).

■ As is the case with probably every legal principle, there are "exceptions" to this one. Transactions between a corporation and its officer or director are not absolutely forbidden. 399 Pa. 59, 159 A.2d 506, 513 (1960). However, those transactions that are not proscribed are governed by a strict standard of fairness. *Robinson v. Brier,* 412 Pa. 255, 194 A.2d 204, 207 (1963).

■ For instance, an officer or director may take personal advantage of a corporate business opportunity if the shareholders consent after full disclosure and it is not detrimental to the creditors of the corporation. *See Hill v. Hill,* 279 Pa.Super. 154, 420 A.2d 1078, 1081 (1980). In addition, an officer or director may seize a corporate business opportunity for himself if the corporation is incapable of taking advantage of the opportunity. *Robinson v. Brier, supra,* 412 Pa. at 207, 194 A.2d 204.

■ It is not disputed that the opportunity to purchase the B75, B100, and Uniloy 300 blow molders constituted "corporate" opportunities with respect to Specialty. The machines were used in the manufacture of blow-molded plastic products. Specialty was in the business of manufacturing such products and ultimately leased the equipment from Doemling. Furthermore, neither of the "exceptions" noted above applies to this case.

Eugene Doemling's acquisition, for himself, of these machines was never formally approved by the shareholders of the corporation. His control of the corporation's affairs was so complete that he did not feel the need to engage in the formality of obtaining the approval of the corporation's sole shareholder, i.e., himself. Doemling readily accepted the benefits of the corporate fiction but refused to comply with its requirements.

Additionally, his acquisition of these machines was highly detrimental to Specialty and its creditors. Specialty was required to expend substantial amounts of money to install, maintain, and repair the machines. Moreover, the subsequent sale of the machines to third parties was detrimental to Specialty and to its creditors in that Specialty's bankruptcy estate was deprived of the profits from their sale which, presumably, would have been available for distribution.

Furthermore, Eugene Doemling has not demonstrated that Specialty was financially incapable, in the requisite sense, of availing itself of the opportunity to purchase these machines for itself. Specifically, he failed to show that Specialty was "practically defunct" when he purchased the machines. Indeed, the evidence strongly suggests that Specialty, although perhaps not "in the best financial shape", was anything but "practically insolvent". *See CST, Inc. v. Mark,* 360 Pa.Super. 303, 520 A.2d 469, 472 (1987).

For example, the balance sheet dated October 31, 1982, which was prepared approximately four (4) months *after* Doemling had purchased the Uniloy 300 in June of 1982, showed that Specialty had $411,-612.55 in total assets and only $245,037.38 in liabilities. This indicates that Specialty, had it purchased the machines for itself, should have been able to secure the required $99,500.00 needed to purchase all three machines.

The earliest indication that Specialty was seriously insolvent is in the balance sheet dated November 30, 1982, prepared one (1) month after the other balance sheet. This later balance sheet shows $355,799.39 in total assets and $586,902.77 in total liabilities.

Of the two balance sheets, the second one would seem to be *un* reliable. It apparently was "contrived" in order to justify the proof of claim for $419,506.70 for loans Eugene Doemling purportedly made to the corporation.

 The conduct proscribed by the aforementioned legal principle concerning usurpation of a corporate business opportunity is the realization of a profit. *Weissman v. Weissman, Inc.*, 382 Pa. 189, 114 A.2d 797, 799 (1956). The test of liability is whether the officer or director has been unjustly enriched. *CST, Inc. v. Mark, supra*, 360 Pa.Super. at 472, 520 A.2d 469. If an officer or director has usurped a corporate business opportunity, the corporation may recover all benefits derived from the transaction. *Lutherland v. Dahlen*, 357 Pa. 143, 53 A.2d 143, 147 (1947). In addition, the corporation is entitled to recover all damages sustained by it, including lost profits. *CST, Inc. v. Mark, Id.*

The Committee is entitled to recover a total of $170,631.00 in damages because of Eugene Doemling's usurpation of Specialty's business opportunities. The breakdown of these damages is as follows.

First, the Committee is entitled to recover the $24,300.00 Specialty expended in leasing the machines from Eugene Doemling.

Secondly, Specialty incurred $23,331.00 in costs in installing, maintaining, and repairing the B75 and B100 blow molders. These costs are recoverable damages.

Thirdly, the Committee is entitled to recover $123,000.00 in profits Eugene Doemling derived from the sale of these three machines to third parties. Eugene Doemling purchased the B75 and B100 blow molders and related equipment for $34,500.00. He realized $150,000.00 from their sale. The B100 was sold for $65,000.00, and the

B75 for $85,000.00. All told, he realized $115,500.00 from these sales (sale proceeds of $150,000.00 − purchase price of $34,-500.00 = net proceeds of $115,500.00). In addition, he realized $7,500.00 in net proceeds from the sale of the Uniloy 300. It was purchased by Doemling for $65,000.00 and was sold for $72,500.00.

In summary, the Committee is entitled to recover the following damages:

| | |
|---|---:|
| Total Rental Payments | $ 24,300.00 |
| Cost of installation and maintenance of B75 and B100 | 23,331.00 |
| Net Proceeds from sale of B75 and B100 | 115,500.00 |
| Net Proceeds from sale of Uniloy 300 | 7,500.00 |
| TOTAL | $170,631.00 |

### B) *Fraudulent Transfers*

Counts II, IV, and VI are alternatives to Counts I, III, and V. The Committee alleges in Counts II, IV, and VI that purchases and subsequent sales of the B75, B100, and Uniloy 300 constituted fraudulent transfers pursuant to 11 U.S.C. § 548(a).

In light of the determination that Eugene Doemling usurped business opportunities belonging to Specialty when he purchased these machines, it will not be necessary to address the claims set forth in these counts of the Amended Complaint.

### C) *Preferential Transfers*

The Committee seeks in Counts VII, VIII, and IX to avoid, pursuant to 11 U.S.C. § 547(b), certain allegedly preferential transfers made to or for the benefit of the Doemlings. Specifically, the Committee seeks in Count VII to avoid and to recover an alleged payment made within one (1) year of Specialty's bankruptcy filing of $2,000.00 by it to the Doemlings as partial repayment of a note held by the Doemlings. It seeks in Count VIII to avoid and to recover alleged payments of $13,-000.00 to Mellon Bank in October and November of 1982 in satisfaction of a note guaranteed by the Doemlings. Finally, it seeks in Count IX to avoid and to recover $13,540.00 in alleged overdue rental payments to the Doemlings, trading as Walnut Street Properties, which were made within

one (1) year of Specialty's bankruptcy petition.

Several essential elements must be satisfied in order for a transfer of a debtor's property to be preferential pursuant to 11 U.S.C. § 547(b). The transfer in question must have been:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt;

(3) made while the creditor was insolvent;

(4) made on or within ninety (90) days of the filing of the petition, or within one (1) year if the creditor was an insider at the time of the transfer; and

(5) the creditor received more than he would have received had the case been brought under Chapter 7 of the Bankruptcy Code.

*In re Gruber Bottling Works, Inc.*, 16 B.R. 348, 351 (Bankr.E.D.Pa.1982).

Any mode, whether direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property (or an interest therein) constitutes a transfer. *See* 11 U.S.C. § 101(50).

The burden of demonstrating the avoidability of the above transfers pursuant to 11 U.S.C. § 547(b) is on the Committee. *See* 11 U.S.C. § 547(g).

The claims in Counts VII, VIII, and IX fail because there has been no showing that the alleged transfers were ever made. Specifically, there is no evidence that Specialty ever paid $2,000.00 to the Doemlings in partial satisfaction of a note held by them (Count VII) or, that Specialty ever paid $13,000.00 to Mellon Bank in satisfaction of a note guaranteed by the Doemlings (Count VIII) or, that Specialty ever paid $13,540.00 in overdue rental payments to the Doemlings, trading as Walnut Street Properties, within one (1) year of Specialty's bankruptcy filing.

## IV

### ADVERSARY NO. 88–502

The Committee claims in Count I that the debt which arises from the judgment entered in its favor in Adversary No. 84–216 is nondischargeable pursuant to 11 U.S.C. § 523(a)(2), (4), and/or (6). Alternatively, it seeks in Count II to have the Doemlings denied a discharge pursuant to 11 U.S.C. § 727(a)(2), (3), or (4) in their own bankruptcy proceeding at Bankruptcy No. 88–2103.

Section 523 of the Bankruptcy Code provides that a discharge granted under § 727 does not apply to certain debts. For instance, 11 U.S.C. § 523(a)(4) provides in pertinent part that:

A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . . . .

(4) for fraud or defalcation while acting in a fiduciary capacity ...;

. . . . .

■ Because the dischargeability of a debt can significantly affect a debtor's ability to obtain a fresh start, the various exceptions to dischargeability enumerated in 11 U.S.C. § 523(a) must be strictly construed against a creditor and in favor of a debtor. *In re Ward*, 88 B.R. 727, 728 (Bankr.W.D.Pa.1988). The appropriate burden of proof under § 523 is the prevailing standard used by the courts to resolve the type of claim underlying the particular exception at issue. *In re Laganella and PT & L Construction Co. v. Braen (In re Braen)*, 900 F.2d 621 (3rd Cir.1990).

In order for the debt at issue in this adversary action to be nondischargeable pursuant to 11 U.S.C. § 523(a)(4), the Committee must show:

(1) that Eugene Doemling was acting in a fiduciary capacity; and

(2) Eugene Doemling committed defalcation in such a capacity.

*In re McCormick*, 70 B.R. 49, 50 (Bankr.W.D.Pa.1987).

■ An express or technical trust, arising by agreement or statute prior to commission of the wrongful act, must exist between the parties to create the requisite fiduciary relationship for purposes of § 523(a)(4). *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393

(1934); *In re Romero*, 535 F.2d 618, 621 (10th Cir.1976).

 Although the matter of what constitutes a fiduciary relationship is determined under federal bankruptcy law, state or other federal law may impose a trust relationship sufficient to create a fiduciary relationship for purposes of § 523(a)(4). *In re Black*, 787 F.2d 503, 506 (6th Cir.1986).

 Eugene Doemling, by virtue of his status as a director of Specialty, at all times relevant, was a fiduciary of Specialty for purposes of § 523(a)(4). Pennsylvania law provides that an officer or director of a corporation is a fiduciary of that corporation. *See* 15 P.S. § 1408 (Purdon's 1969).

Neither the language of the statute nor the legislative history indicates how the concept of defalcation is to be construed. At the very least, no indication is given that it is to be applied narrowly or restrictively. To the contrary, it is an extremely broad concept. *In re Johnson*, 691 F.2d 249, 254–57 (6th Cir.1982).

 In general, defalcation is a failure to account for property that has been entrusted to one. *Matter of Vickers*, 577 F.2d 683, 687–88 (10th Cir.1978); *see also, Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2nd Cir.1937). Defalcation is broader than either misappropriation or embezzlement and can be a mere deficit resulting from a fiduciary's misconduct, even though the fiduciary may have derived no benefit therefrom. *In re Cowley*, 35 B.R. 526, 529 (Bankr.D.Kan.1983). It is not necessary to prove that the wrongful conduct was intentional. *In re Interstate Agency, Inc.*, 760 F.2d 121, 125 (6th Cir.1985). Mere negligence or ignorance may suffice. *In re Cowley, supra* at 529. The standard for ascertaining whether defalcation has occurred is objective. Knowledge of the facts underlying the breach of fiduciary duties may suffice, regardless of the fiduciary's knowledge of his duties under the law. *In re Johnson, supra* at 255.

 The purchasing by Eugene Doemling of the B75, B100 and Uniloy 300 blow molders constituted defalcation. He misappropriated for himself property which he had a duty to purchase for Specialty and, as a consequence, caused a gain for himself and a loss for Specialty. Such activity should not be rewarded or encouraged by a bankruptcy discharge of debt.

Appropriate Orders will be entered.