**AIR SHELLS, INC. and L. Robert Kimball, Plaintiffs and Counterdefendants,**

v.

**Horrall HARRINGTON, Defendant and Counterclaimant,**

and

**H.P. Domes, Inc., Intervenor, Counterclaimant.**

**Civ. A. No. 85–0834.**

United States District Court, W.D. Pennsylvania.

Oct. 26, 1988.

James P. Hollihan, Manion McDonough & Lucas, Pittsburgh, Pa., for plaintiffs and counterdefendants.

Pat A. Capolupo, Clairton, Pa., for defendant and counterclaimant.

## OPINION

GERALD J. WEBER, District Judge.

This patent infringement action concerns the methods and apparatus for constructing concrete shell domes, structures which are often seen along our highways as storage buildings for roadsalt. The case was tried to the court and the parties have filed extensive briefs. The following contains our findings of fact and conclusions of law.

### FACTS

Beginning in the early 1960's, defendant Harrington became involved in the design and construction of concrete dome buildings. In 1964 he obtained a patent for a

construction process for such structures and several experimental buildings were built with this process. This patent and the method it describes are not at issue in this suit.

By 1973, Harrington had obtained 2 additional patents on methods and apparatus for the construction of concrete shell buildings. Patent 3,619,432 (hereinafter '432 patent) described a pie-slice shaped inflatable form for use in constructing a dome in successive pie-slice segments. Concrete was applied to the exterior of the form. When the concrete had hardened forming one pie-slice segment of the dome, the form was moved and the process repeated creating the next segment of the dome. In this way a large dome could be created segmentally.

Patent 3,719,341 (hereinafter '341 patent) described a method and apparatus which permits casting the entire dome in one operation, rather than in successive segments. Essentially, a circular perimeter concrete base wall is erected and the fabric form is clamped to the top of the wall along the entire perimeter. The fabric is then inflated creating the form for the entire shell. Concrete is applied to the exterior of the fabric and after it hardens the fabric form is deflated and the clamping mechanism is removed.

In 1971, Harrington incorporated Air Shells, Inc. for the purpose of taking commercial advantage of his patented innovations. Short of capital and technical services, Harrington sought a co-venturer and thus began discussions with L.R. Kimball Associates, (hereinafter LRK) an architectural and engineering firm headed by plaintiff L. Robert Kimball. These discussions culminated in three written agreements which together embody the parties' understanding of their relationship. At the bottom line Harrington relinquished 51% of Air Shells stock to LRK in exchange for LRK's financial and technical assistance.

With the backing of LRK, Air Shells designed and had fabricated the necessary fabric forms and clamping devices described in the '432 and '341 patents. Air Shells then participated in the construction of several concrete dome buildings.

Air Shells had no success in obtaining contracts for the multi-segment domes built in accord with the '432 patent, and so it focused on building the smaller unitary domes employing the methods and apparatus described in the '341 patent. Between 1975 and 1981, Air Shells participated in 48 concrete dome construction projects, all employing the '341 patent claims.

For our purposes it is important to understand the nature of Air Shells' participation in construction projects. At the apparent insistence of LRK, Air Shells did not act as contractor on construction jobs but rather would rent its fabric forms and clamping devices and provide technical assistance and supervision to the general contractor on the job in return for a rental and license fee.

Beginning in 1977, LRK's reluctance to have Air Shells act as a contractor jeopardized Air Shells' participation in several projects. General contractors were not satisfied with merely renting the forms and clamping devices, but insisted that Air Shells participate as a contractor and thereby share the risk. Rather than lose these jobs to more conventional construction methods, Harrington personally acted as co-contractor. Under this arrangement, the general contractor and Harrington in his personal capacity would lease the equipment from Air Shells and pay the license and rental fee. Thus Air Shells got the contract, the general contractor got someone to share the risk, and Harrington shared in the contractor's profit as well as seeing his interest in Air Shells enhanced. LRK was fully aware of Harrington's participation in his personal capacity and acquiesced in it, presumably because it too saw Air Shells obtain contracts it would otherwise have lost.

Throughout its existence Air Shells itself has been something of a shell. Its only employee was Harrington and almost all infusions of cash and technical assistance were provided by LRK. Harrington and principals at LRK served as Directors. Aside from Harrington and the accounting

books, Air Shells had no independent vitality.

On January 1, 1982, Harrington was discharged from his salaried position at Air Shells, although he remained as Director for several more years, at least on paper. This move is described by LRK as a cost-cutting measure because Air Shells was still not a profitable venture despite years of operation. Harrington continued to act as a contractor on construction projects, again with the apparent approval of LRK which saw Air Shells profit from the rental and license fees generated by Harrington's projects.

Over the next several years the relationship between Harrington and LRK steadily deteriorated. Disputes arose over the amounts demanded by Air Shells for rental and license fees and the amounts Harrington was willing to pay. Ultimately Harrington began using his own forms and clamping devices without payment of any fees to Air Shells.

In April 1985, Harrington and Phillip Vittore created H.P. Domes, Inc. Harrington and Vittore had developed a new clamping mechanism for anchoring the fabric form to the concrete base wall and they applied for a patent. With H.P. Domes, Inc. acting as contractor they built a number of unsegmented concrete shell buildings using this new clamping method.

Plaintiffs Air Shells and Kimball have charged that Harrington's new clamping mechanism infringes the claims described in patent '341. Defendants deny infringement and contend that their clamping device is structurally and functionally different from the patented device described in '341, and produces substantially different results. This is the crux of the litigation.

## DISCUSSION

### 1) Literal Infringement

Plaintiffs charge defendants with literal infringement of Claim 1 of the '341 patent. We look to Claim 1 and the illustration of Figure 4 from the patent:

1. A form assembly for constructing a concrete shell for a building comprising a wall structure defining the perimeter of a building space and a concrete shell covering that space, said form assembly comprising:

(a) a rigid structural frame, conforming to the configuration required for one segment of said concrete shell and having a plurality of form-supporting members extending around the perimeter of said frame;

(b) an inflatable form, mounted on said frame and affording a substantially air-tight chamber spanning the space between said form-supporting members, said inflatable form including an outer layer formed of a strong, relatively inelastic fabric;

(c) a retainer member, affixed to one of said support members and affording a substantially continuous channel of given height and width facing outwardly of the space spanned by the fabric outer layer of said inflatable form;

(d) and a rail member, wrapped in the edge portion of said fabric outer layer corresponding to said one support member, said rail member having a height smaller than the height of said channel but having an effective diagonal thickness substantially greater than the effective internal height of said channel, permitting ready insertion of said rail member and the edge portion of said fabric outer layer into said channel when the form is deflated for releasable mounting of said outer fabric layer on said frame, said rail member rotating within said channel into locking engagement therewith upon inflation of said form.

FIG. 4

For comparison, the following is an illustration of defendants' design with the rail member or spline, wrapped in the end of the fabric form, inserted into a pre-cast channel in the concrete base wall and further secured by a metal retainer plate:

Of the 4 elements described in Claim 1, two appear to be present in defendants' embodiment. There is little dispute that both sides employ a fabric form which when inflated creates the support for the casting of the concrete shell. Also, although defendants claim certain differences in how their version works, both sides wrap the edge of the fabric form around a wood rail or "spline", and insert it into a retaining channel.

The critical differences between plaintiffs' Claim 1 and defendants' embodiment lie in the "rigid structural frame" identified in paragraph (a) of Claim 1, and the nature, orientation and function of the channel described in paragraph (c).

Patent '341 describes a clamping assembly composed of various metal channels and bars. This assembly is attached to the concrete base wall by expansion bolts and is to be removed upon completion of the

project. It is this assembly which creates the channel which holds the spline wrapped in the edge of the fabric form. It is clear from a reading of Claim 1, that this clamping assembly is what paragraph (a) described as a "rigid structural frame."

On the other hand, defendants have eliminated the need for this cumbersome metal framework by casting the necessary channel into the concrete wall itself. By the use of special molds or "formers" a channel is cast into the interior surface of the concrete base wall when it is poured. The '341 patent neither describes nor envisions any special preparation of the base wall, and we think it quite clear that "rigid structural frame" in the patent refers to the metal clamping assembly rather than the base wall. Therefore plaintiffs fail to establish literal infringement of Claim 1, paragraph (a).

Looking to paragraph (c) of Claim 1, we note that the patent specifies an outwardly facing channel within which the spline wrapped in the edge of the fabric form rotates and pins the fabric in the channel. Plaintiffs' claim to see this element in the retainer plate employed by defendants. According to plaintiffs, this retainer also creates an outward facing channel which retains the spline and fabric.

We disagree with plaintiffs on several counts. First of all, defendants' retainer plate is not a channel in the same sense as plaintiffs' patent. The spline is not fully inserted into the C shaped channel, but is merely held by the lip of the plate. Secondly, the spline does not rotate within this channel to create the locking force upon the fabric but is merely pulled against it by the tensions created during inflation. Any rotation locking of the spline, if it occurs at all, occurs within the cast concrete channel in the base wall which faces inward, not outward. Therefore, we conclude that plaintiffs fail to establish a literal infringement of Claim 1, paragraph (c).

### 2) Doctrine of Equivalents

If a device incorporates the concept and principles of an invention but merely substitutes some equivalent item for one of the patented elements, it will still be held to be an infringement. *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.,* 339

U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). Simply put, a device which does not literally infringe will be held to be an infringement if it performs "substantially the same function in substantially the same way to obtain substantially the same result as the claimed invention." *Id.,* at 608, 70 S.Ct. at 856; *Sanitary Refrigerator Co. v. Winter,* 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929); *Datascope Corp. v. SMEC Inc.,* 776 F.2d 320, 325 (Fed.Cir.1985). The purpose of the doctrine is to prevent the practice of a fraud upon the patent. *Graver,* 339 U.S. at 607–08, 70 S.Ct. at 855–56.

As described above, two of the elements of plaintiffs' patent '341, those embodied in paragraphs (b) and (d) of Claim 1, are present in defendants' method and apparatus. As to paragraphs (a) and (c), plaintiffs contend that defendants' method and apparatus adopt and employ those concepts under another guise to achieve the same results.

We recognize some important similarities in the two designs: the use of a spline wrapped in the edge of the fabric form; the insertion of the spline into a slightly larger channel; and the locking effect created by pinning the fabric between spline and channel upon inflation. There are, however, significant functional differences in the competing designs, both in method and result.

There are two fundamental differences in defendants' design. First, the necessary channel which receives and retains the spline and fabric is created by a form which casts the channel into the base wall itself. Second, whereas the '341 patent specifies an outwardly facing channel, the channel cast in defendants' base wall faces inward. These 2 elements alone and in concert, create significant and varied differences in both operation and result.

Casting the channel into the base wall eliminates the need for the heavy, unwieldy and expensive metal clamping mechanism described in plaintiffs' patent '341. This generates a cost savings in both labor and equipment. Also, the fact that the channel is part of the base wall permits the force exerted by inflation of the form to be transmitted directly to the concrete ·base wall, rather than to the heads of the expan-

sion bolts used to anchor plaintiffs' clamping mechanism to the base wall. This provides greater strength and stability and reduces the risk of failure. Because the fabric is pinned directly to the base wall there is less leakage of air out and water in, another significant advantage during construction.

As to defendants' change in the orientation of the channel, facing inward not outward, plaintiffs correctly argue that the mere reversal of an element will not avoid a finding of infringement. E.g., *Maxon v. Maxon Construction Co.*, 395 F.2d 330 (6th Cir.1968). However, to sustain a finding of infringement we must conclude that "the operation and results achieved by the accused device are essentially the same as the patented device." *Id.*, 395 F.2d at 330. Unfortunately for plaintiffs, the change in orientation of the channel achieves several significant advantages in both operation and results.

With plaintiffs' design workmen must be stationed on both sides of the base wall to accomplish the insertion of the spline and fabric into the channel. Because defendants' channel faces inward, all work can be performed inside the base wall resulting in a labor reduction of 5 men to 3. Also, because the channel faces inward the amount of fabric form taken up on the spline is easily adjusted and one section can be adjusted without disturbing others. With plaintiffs' design, adjustment is difficult and because the clamping must proceed sequentially around the perimeter of the base wall, adjustment of one section requires that all subsequently clamped sections be disassembled first.

Plaintiffs' design requires workmen to insert wedges between the spline and the channel, and to constantly monitor and tap these wedges to hold the spline in place during inflation. In defendants' design, no wedges are required because the retainer plate prevents the spline from coming free and therefore fewer workmen are required during inflation. Defendants method, employing a retaining plate which prevents the spline from slipping out of the channel, creates more stability in wind and during inflation than is offered by plaintiffs' wedges.

Perhaps the most significant difference in operation occurs at conclusion of the casting process. In plaintiffs' design, after the new concrete dome has hardened, the clamping mechanism and the spline are covered by the thickest part of the dome. Removal of the clamping mechanism is tedious and time consuming, and risk of damage to the fabric form is considerable. In defendants' design, because the channel faces inward it is not obstructed by the newly cast wall and disassembly is as easy as removing the retainer plate and sliding the spline out of the channel. Again the labor savings is considerable and risk to the fabric form is decreased.

Finally it is also important to note that defendants' design has capabilities not available in plaintiffs' design. Because defendants' channel faces inward, straight vertical walls or onion shape domes (in which the walls extend outward from the base) could be constructed without the form coming loose from the channel. In plaintiffs' design, such projects would cause the spline to pull out of the channel.

In short, the differences between the parties' designs are significant and defendants' developments achieve significant functional advantages not present in plaintiffs' patent '341. This is not a case where the same elements are disguised in a different form to work a fraud on the patentholder, but one in which substantially different elements achieve significant advantages in function and result. We therefore conclude that plaintiffs have failed to establish infringement by equivalency.

### 3) Director's Fiduciary Duty

■ Plaintiffs charge defendant Harrington with breach of a fiduciary duty because he engaged in a business in direct competition with Air Shells while serving on the company's Board of Directors. Under Pennsylvania law a Director may not seize a business opportunity for his own benefit if the company could have taken advantage of it. E.g., *Seaboard Industries, Inc. v. Monaco*, 442 Pa. 256, 276 A.2d 305 (1971).

Of course there can be no breach of duty if the company is unable to take advantage of the business opportunity. *Robinson v. Brier*, 412 Pa. 255, 194 A.2d 204 (1963).

As we noted above, Air Shells (at the insistence of Kimball) has consistently refused to participate in projects as a contractor, preferring to merely rent its forms and clamps to the firm doing the construction work. On the other hand Harrington has become a construction contractor, initially as an individual and now as H.P. Domes. In this respect Harrington does not compete directly with Air Shells because he is competing for contracts and obtaining jobs in a business that Air Shells steadfastly refuses to enter.

It is also apparent that Air Shells is no longer competing for *any* work. Since Harrington's firing in 1982 Air Shells has had no employees and LRK has made only token efforts to obtain business. Indeed Harrington in his reincarnation as a contractor was the only person actively pursuing business which Air Shells could profit from. It would be anomalous to hold someone liable for usurping a business opportunity from someone who isn't even looking for such opportunities.

There is also evidence that on a number of Harrington's jobs, Air Shells forms were inadequate in size, shape or condition and the company declined to make or acquire acceptable forms. In those cases Air Shells was simply incapable of seizing the opportunity and Harrington was justified in obtaining the necessary equipment elsewhere.

Finally, it is important to recall that Harrington initially entered the contracting business with the knowledge and acquiescence of Air Shells and Kimball, and indeed Harrington's independent venture was to their benefit because he saved jobs and revenue for Air Shells which would otherwise have been lost due to Kimball's refusal to allow Air Shells to enter the contracting business. A company which approves of and benefits from a Director's private venture can hardly claim breach. See, *Robinson v. Brier*, 412 Pa. 255, 194 A.2d 204.

For the reasons stated we conclude that plaintiff has failed to establish a breach of fiduciary duty and judgment will be entered in favor of defendant on this claim.

### 4) Counterclaims

Defendants have asserted several Counterclaims which we briefly address here.

Harrington seeks to recover certain royalties from Air Shells which accrued in connection with past Air Shells' projects involving Harrington's patents. While Air Shells admits that these royalties have accrued, it contends that these royalties are *payable* only after LRK has been reimbursed for all its advances to Air Shells. After reviewing the three documents which constitute the agreement between the parties and reading them in pari materia, we think it unambiguous that the parties intended LRK's claims to have priority over all other obligations of Air Shells, including any royalties due Harrington. Indeed the parties operated in this manner for many years, accruing the royalties on the books but not paying them out. Consequently Harrington's attempt to cancel the license agreement on the patents is without force and effect.

Defendants also alleged that plaintiffs interfered with certain contractual relationships of H.P. Dome by contacting its customers and suppliers. However the evidence adduced at trial failed to support these claims.

The few contacts identified consisted essentially of the true statement that Air Shells had instituted a patent infringement action against Harrington and H.P. Dome, litigation which was not without arguable merit. In any event defendants have failed to establish any injury from these contacts.

Finally, defendants seek an award of attorney's fees under 35 U.S.C. § 285 for time expended defending the claims of infringement of the '432 patent, claims which were withdrawn prior to trial. Fees under this provision are to be awarded in "exceptional cases" at the court's discretion. Given the complexity of the litigation and the technical interrelated aspects of the two sister patents, '432 and '341, we cannot say that this case presents an exceptional situation which would justify an award of fees.

904

## CONCLUSION

For the reasons stated above, we conclude that both sides have failed to establish their respective claims and counterclaims. An appropriate order will be entered.

## ORDER

AND NOW, in accord with the accompanying Opinion, it is hereby ORDERED that Defendants' methods and apparatus are held not to infringe Patent 3,719,341. JUDGMENT is ENTERED in favor of Defendants on all claims in Plaintiffs' Complaint, and in favor of Plaintiffs on Counts II through IV of Defendants' Counterclaim.

The Clerk is DIRECTED to mark the matter CLOSED.