### In re BEAVER VALLEY BUILDER'S SUPPLY, INC., Debtor.

### DRESSEL ASSOCIATES, INC., Movant,

### v.

### BEAVER VALLEY BUILDER'S SUPPLY, INC., Respondent.

**Bankruptcy No. 94–22140–BM.**
**Motion No. 94–1414M.**

United States Bankruptcy Court,
W.D. Pennsylvania.

Feb. 9, 1995.

**508**

William Pineo, Trustee, Meadville, PA.

Mark L. Glosser, Glosser & Shreve, Pittsburgh, PA, for trustee.

John D. Eddy, Eddy & Osterman, Pittsburgh, PA, for debtor and Gabriel Sacco and Lucille Sacco.

Kathleen A. Gallagher, Pittsburgh, PA, for First Commerce Inv. Co.

Richard G. Placey, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for Essroc Materials, Inc.

Kevin C. Hansen, Meyer Unkovic & Scott, Pittsburgh, PA, for Dressel Associates, Inc. and Gary L. Reinert, Sr.

### MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Dressel Associates, Inc. (hereinafter "Dressel") has moved pursuant to 11 U.S.C. § 362(d)(1) and (2) for relief from the automatic stay so that it may exercise its rights under state law with respect to collateral of debtor Beaver Valley Builder's Supply, Inc. (hereinafter "BVBS") that secures an obligation to Dressel.

First Commerce Investment Company (hereinafter "FCIC") and the chapter 7 trustee object to the motion. They assert that the motion should be denied because there is equity in the collateral that is subject to Dressel's lien. The amount of Dressel's lien should be reduced to the amount at which it was purchased, they argue, because Dressel's principal qualified as an insider of BVBS. Also, they argue that the value of the collateral that is subject to Dressel's lien is significantly greater than Dressel claims. As support for this latter proposition, FCIC and the trustee accuse Dressel's principal and debtor's principal of "scheming" with one another to conceal certain of debtor's assets from the trustee.

Dressel's motion for relief from the automatic stay will be denied for reasons set forth below.

–I–

### FACTS

BVBS is in the construction supply and highway construction business. Atlantic Materials, Inc. ("Atlantic"), Eastern Specialized Equipment Corporation ("Eastern"), Concrete Equipment Leasing, Inc. ("Concrete"), and G. Lucianni Corporation ("Lucianni") are its wholly-owned subsidiaries. Gabriel Sacco

is its sole shareholder and was its president. Lucille Sacco, his wife, was its secretary.

On November 12, 1987, BVBS and its subsidiaries entered into a revolving credit and term loan agreement in the amount of $9,350,000.00 with Integra Bank/Pittsburgh.[1] As security for the obligation, BVBS and its subsidiaries granted Integra a first priority security interest in all of their present and after-acquired assets, including chattel paper, documents, equipment, fixtures, general intangibles, instruments, inventory, and the proceeds derived from each of the above. Included among this collateral were BVBS' accounts receivable and two (2) life insurance policies BVBS had purchased upon the life of Gabriel Sacco.

As additional security for the obligation, BVBS and its subsidiaries executed various first mortgages in favor of Integra. Included among the properties so mortgaged were the following properties to which BVBS had legal title:

(a) 909 Glenwood Avenue, Ambridge, Pennsylvania;

(b) 930 Glenwood Avenue, Ambridge, Pennsylvania;

(c) 83.6 acres of undeveloped land in Bell Acres Borough, Pennsylvania; and

(d) approximately 8 acres of undeveloped land in Bell Acres Borough, Pennsylvania.

Integra duly perfected its security interest in all of the above collateral securing the loan.

Gary Reinert is the principal of Road Runner Planning and Consulting, Dressel, and Power Contracting, Inc. Reinert has never been an officer, board member, or shareholder of BVBS or its subsidiaries. He further testified that he never determined what jobs BVBS or its subsidiaries bid and never paid any of their employees.

Beginning in 1990 or 1991, Reinert loaned money on several occasions to Gabriel Sacco and his wife. In exchange for the loans, the Saccos executed promissory notes in favor of Reinert. No security interest for the loans was ever granted. Reinert loaned to the Saccos several hundreds of thousands of dollars over the years.

Sacco approached Reinert sometime in 1993 and asked Reinert to lend him an additional $250,000.00 to pay the interest on the above debt owed to Integra. When Reinert balked and demanded collateral to secure repayment of the obligation, it was agreed that Sacco would "sell" a piece of equipment of Reinert for $250,000.00 until Sacco obtained a loan from another financial institution. They further agreed that Sacco would "repurchase" the equipment once he had obtained new financing.

Sacco again approached Reinert early in 1994 and requested yet another loan to keep Integra from taking action against BVBS. Sacco informed Reinert that Integra "would close him down" if Sacco did not make a payment on the loan.

Integra had "called" the loan and had demanded payment in full when BVBS and its subsidiaries defaulted. On February 7, 1994, Integra notified BVBS and its co-obligors that they were in default of their obligations under the revolving credit agreement in the amount of $3,699,776.34 in principal; $196,194.60 in unpaid interest; and $55,160.83 in late charges. Integra further informed BVBS and its co-obligors that they were responsible for additional interest at the rate of five percent (5%) pursuant to the agreement and for additional expenses such as attorney's fees and expenses. Judgment was entered in favor of Integra on March 3, 1994, in state court against BVBS and its co-obligors in the amount of $4,063,982.69.

Reinert became concerned that he would not recoup any of the money he had loaned to Sacco if Integra took action against Sacco's various corporations and actively involved himself in negotiations to arrive at a "workout" between Integra and Sacco's corporations.

In February of 1994, Reinert met with Sacco and Sacco's attorney. He also was

---

1. The agreement in question was with Equibank, which subsequently merged into Integra Bank/Pittsburgh. All references to the bank with which BVBS and its subsidiaries dealt will be to Integra instead of Equibank.

introduced to Integra by Sacco and attended several meetings between Sacco and Integra in an attempt to "keep Sacco afloat" until a "workout" could be arranged. Reinert subsequently proposed to Integra that BVBS and its subsidiaries sell some of their assets in an orderly liquidation to raise funds with which to repay their obligation to Integra. He further offered to pay Integra up to $250,000.00 until the orderly liquidation was completed.

During these negotiations, Reinert provided Integra with his own personal financial statement and with Dressel's financial statement. The statements had been requested by Integra, which desired to know whether Reinert was financially able to assist in consummating a "workout".

Reinert also provided Integra with various documents pertaining to BVBS and its subsidiaries. Sacco had provided the information to Reinert, who then forwarded it to Integra. Among the documents Reinert forwarded to Integra were audited consolidated financial statements for BVBS and its subsidiaries as of December 31, 1990, December 31, 1991, and December 31, 1992, respectively.

The audited consolidated statement for 1990 stated that the total value of all buildings, machinery, and equipment after depreciation was $5,214,341.00. BVBS' share of these assets had a value after depreciation of $4,004,597.00.

The audited consolidated statement for 1991 stated that the total value of all buildings, machinery, and equipment after depreciation was $5,642,549.00. BVBS' share of these assets had a value after depreciation of $4,454,421.00.

The audited consolidated statement for 1992 stated that the total value of all buildings, machinery, and equipment after depreciation was $5,825,779.00. BVBS' share of these assets had a value after depreciation of $4,721,895.00.

Reinert also provided Integra with accounts payable records for BVBS and Atlantic; a list of "missed job opportunities" for BVBS from March of 1989 through September of 1993; employee payroll listings; BVBS' "work on hand"; a resume of work completed by BVBS since 1976; and accrued liabilities of BVBS and its subsidiaries as of December 31, 1993. These documents had been provided by Sacco to Reinert, who then forwarded them to Integra.

On March 3, 1994, Reinert drafted and sent a letter to Integra in which he proposed, upon execution of a forbearance agreement, to deliver a check to Integra for $145,662.48 and to pay on behalf of BVBS and its co-obligors interest due in the amount of $25,000.00 per month for a period of six (6) months. He further proposed "assisting" BVBS and its co-obligors in an orderly liquidation of their assets and would attempt to meet principal payments in the amount of $50,000.00 for each of the next five (5) months. He proposed liquidating the assets as they were released by Integra with the objective of paying in full the outstanding principal amount due and owing by December 31, 1995. At the time he made this proposal, Reinert believed that both he and Integra could be "made whole" under this arrangement.

On March 17, 1994, Integra's counsel sent to Reinert's attorney four (4) copies of a document entitled "Conditional Forbearance by Integra Bank/Pittsburgh From Actions To Collect Obligations Due" requesting that the required signatories execute it.

The documents were executed shortly thereafter by Integra, by Gabriel Sacco in his capacity as president of BVBS, Atlantic, Eastern, Concrete, and Lucianni, and by Gabriel Sacco and Lucille Sacco in their individual capacities as guarantors. Neither Reinert nor Dressel was a signatory to the agreement.

Under the terms of the agreement, Integra agreed to forbear from instituting legal action to collect on the past-due debt. In consideration for Integra's agreement to forbear, BVBS, Atlantic, Eastern, Concrete, Lucianni, and the Saccos agreed to pay by March 18, 1994, the contract rate of interest in the amount of $158,087.28. In addition, the latter parties agreed to present to Integra by April 8, 1994, a plan providing for liquidation of the collateral pledged to Integ-

ra or for payment of all obligations owed to Integra.

On March 18, 1994, Power Contracting, another corporation that is wholly-owned by Reinert, issued a check in the amount of $158,087.28 payable to Gabriel Sacco, Lucille Sacco, and BVBS. The payees promptly endorsed the check payable to the order of Integra.

On June 1, 1994, Dressel purchased Integra's position for the sum of $1,850,000.00. Integra subsequently assigned the loan agreement, the security agreement, and the mortgages to Dressel.

An involuntary chapter 7 petition was brought against BVBS on June 28, 1994, by three local labor unions that claim they are owed a total of $101,469.14 for unpaid contributions to employee pension and benefit plans.

The schedules filed by debtor listed assets with a declared value of $2,364,250.00 and total liabilities of $17,675,992.01.

Schedule A, Real Property, listed five (5) properties. Included among the properties were the above two (2) properties located at 909 and 930 Glenwood Avenue in Ambridge, Pennsylvania, and the two (2) undeveloped sites in Bell Acres Borough, Pennsylvania. The fifth property listed was a .13 acre site in Economy Borough, Pennsylvania. The total declared value of the properties was $940,000.00.

Schedule B, Personal Property, listed assets with a declared value of $1,424,250.00. Included among the assets were various vehicles, machinery, equipment, and inventory with a declared value of between $500,000.00 and $1,000,000.00; two (2) life insurance policies upon the life of Gabriel Sacco with an unknown value; and accounts receivable in the amount of $422,750.62.

Schedule D, Creditors Holding Secured Claims, listed secured debt in the amount of $9,430,000.00. Included among such creditors were Dressel as assignee of Integra's interest in the amount of $4,200,000.00; FCIC in the amount of $3,500,000.00; and the Internal Revenue Service in the amount of $1,700,000.00 for unpaid taxes.

Schedule E, Creditors Holding Unsecured Priority Claims, listed unpaid taxes owed to federal and state taxing authorities in the amount of $2,602,000.00.

Schedule F, Creditors Holding Unsecured Nonpriority Claims, listed debt in the amount of $5,631,992.01.

The chapter 7 trustee was appointed on July 22, 1994.

Subsequent to the filing of the involuntary petition, Dressel executed against property owned by debtor's co-obligors pursuant to the judgment Integra had obtained on March 3, 1994.

Sheriffs' sales of personal property owned by Concrete were conducted on September 18, 1994 and September 20, 1994. A sheriff's sale of personal property belong to Eastern was conducted on December 14, 1994. Dressel bid its costs and purchased the property sold at each of the sales.

Sheriff's sales of real property owned by various co-obligors were conducted in January of 1995. Real property belonging to Concrete was sold on January 3, 1995, and on January 9, 1995. Gary Reinert purchased the former property for $40,000.00. Dressel bid its costs and purchased the latter property. It was disclosed at hearing that another property was purchased by Dressel for the sum of $816,000.00. The next highest bid for the property was $815,000.00.

Dressel has sold to third parties some of the personal property it had purchased at the above sheriffs' sales. On October 1, 1994, Dressel sold vehicles and equipment to Beaver Valley Aggregates for the sum of $363,050.00. On October 20, 1994, it sold a vehicle to Three Rivers Aggregates for the sum of $7,500.00. On October 14, 1994, several vehicles were sold to August Trucking for the sum of $192,000.00. On November 18, 1994, Dressel sold equipment and vehicles to Vitucci Truck Sales for the sum of $21,000.00. The total amount realized by Dressel from these sales is $583,550.00.

The trustee indicated at the hearing on Dressel's motion and the objections thereto that an account under his control and subject to Dressel's security interest presently contains $110,000.00.

One of the insurance policies upon the life of Gabriel Sacco that BVBS purchased has lapsed. The other policy has a cash surrender value of $6,000.00.

Several vehicles and pieces of construction machinery and equipment bearing the logo of BVBS have been used at a highway construction site since the filing of the involuntary petition. They were seen at the site as recently as November 3, 1994. Certain of these vehicles and pieces of equipment have the name of Dressel covering the logo of BVBS. Gabriel Sacco has been at the site directing some of the workers.

Dressel has filed a motion requesting relief from the automatic stay. It avers that relief should be granted because its interest in debtor's property securing the debt owed to it is not adequately protected; and because debtor has no equity in the property.

FCIC and the chapter 7 trustee have objected to Dressel's request. They contend that Dressel's interest in debtor's assets is adequately protected and that debtor has equity in those assets above and beyond the value of Dressel's claim.

On January 11, 1995, voluntary chapter 7 petitions were filed by the trustee of BVBS on behalf of Atlantic, Eastern, Concrete, and Lucianni. The accompanying schedules have not yet been filed in these cases.

An evidentiary hearing was held on Dressel's motion and on the objections thereto on January 13, 1995, at which time both sides were given an opportunity to present evidence on controverted issues.

The following facts were stipulated to as true at the hearing:

(1) the amount due and owing under the credit agreement of November 12, 1987, was $4,232,600.67 as of August 31, 1994;

(2) debtor has defaulted on its obligations under the agreement and has no ability to repay the debt;

(3) the property subject to the security interest granted to Integra is not necessary to an effective reorganization as debtor is in a chapter 7 proceeding;

(4) Integra had a first priority, perfected prepetition lien against all of debtor's property; and

(5) FCIC has a junior prepetition lien against all of debtor's property in the amount of $3,500,000.00.

–II–

## ANALYSIS

FCIC and the trustee insist that Dressel's interest in debtor's property is adequately protected and that there is substantial equity in the assets subject to Dressel's interest. Their opposition to Dressel's request is premised upon two propositions.

They first argue that, pursuant to *In re Papercraft Corporation*, 165 B.R. 980 (W.D.Pa.1994), Dressel's claim should be reduced from $4,232,600.67—the amount due and owing under the agreement of November 12, 1987—to $1,850,000.00—the amount Dressel paid Integra when it purchased the claim.

In addition, they assert that the value of the collateral subject to Dressel's secured claim exceeds the value of Dressel's interest therein. Reinert and Sacco are accused of engaging in a scheme to conceal certain of debtor's assets from the trustee and of covertly utilizing them for their own personal benefit.

We shall consider these matters *ad seriatim.*

### A) *Should The Value Of Dressel's Interest Be Reduced?*

The decision in *Papercraft*, it should be noted, was rendered by another member of this court. Although we have the utmost respect for other members of this court and normally accord great deference to their holdings, we are not bound thereby. *See In re Suburban Motor Freight*, 134 B.R. 617, 626 (Bankr.S.D.Ohio 1991), *aff'd*, 156 B.R. 790 (S.D.Ohio 1992), *aff'd*, 998 F.2d 338 (6th Cir.1993).

Having said this, we need not decide whether we adopt the reasoning of *Papercraft* before adjudicating the merits of respondents' contention that Dressel's claim

should be reduced to the amount that it paid Integra in purchasing Integra's claim. The situation presented in the instant case is distinguishable in critical respects from the situation in *Papercraft*. Accordingly, we need not arrive at the same outcome as in *Papercraft* even if we adopt its rationale.

The outcome in *Papercraft* was based in large measure upon findings that the corporation that purchased a prepetition claim against the debtor at a substantial discount qualified as an "insider" of the debtor (165 B.R. at 987) and that it owed a fiduciary duty to debtor which it violated when it purchased the claim (165 B.R. at 989). These findings in turn were predicated upon the finding that the individual who had purchased the claim on behalf of the corporation was a member of debtor's board of directors and was an officer of the corporation on whose behalf he had purchased the claim (165 B.R. at 984).

The individual who had purchased the claim against debtor was an "insider" of the debtor by virtue of his membership on its board of directors (165 B.R. at 984) and had breached his fiduciary duty to the debtor corporation and to its shareholders (165 B.R. at 989–90). The corporation on whose behalf he had purchased the claim was vicariously liable as a matter of law under the doctrine of *respondeat superior* for the individual's breach of his fiduciary duty to the debtor corporation (165 B.R. at 991).

The court held that an insider who so purchases a prepetition claim of a debtor **cannot** enforce the claim at its full value and further held that its claim should be reduced to the amount it had paid in purchasing it (165 B.R. at 993–94).

The Bankruptcy Code defines "insider" as follows:

"Insider" includes— ...

    (B) if the debtor is a corporation—

    (i) director of the debtor;

    (ii) officer of the debtor;

    (iii) person in control of the debtor;

    (iv) partnership in which the debtor is a general partner;

    (v) general partnership of the debtor;

    (vi) a relative of a general partner, director, officer, or person in control of the debtor ...

11 U.S.C. § 101(31).

The above definition contains the word "includes". When the word "includes" occurs in the Bankruptcy Code, it is not limiting in scope. *See* 11 U.S.C. § 102(3). Consequently, the six (6) categories of corporate insider set forth at § 101(31) are not exhaustive. *See In re Pittsburgh Cut Flower Company, Inc.,* 124 B.R. 451, 459 (Bankr. W.D.Pa.1991).

Occurrence of the word "includes" in the above definition suggests an expansive rather than a restrictive interpretation. *See In re Papercraft,* 165 B.R. at 987. The definition of "insider" is flexible and not amenable to precise formulation. *See In re Pittsburgh Cut Flower,* 124 B.R. at 459. An insider is any person or entity:

... who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor.

H.R. Report No. 595, 95th Cong., 1st Sess. 312 (1977); S.Report No. 989, 95th Cong., 2d Sess. 25 (1978); U.S.Code Cong. & Admin.News 1978 at pp. 5787, 5810, 6269.

FCIC and the trustee have not identified any **direct** relationship between Dressel and BVBS or any involvement of the former in the affairs of the latter. They instead attempt to establish Dressel's insider status on the basis of **Reinert's**[2] involvement in the affairs of BVBS. Specifically, they allege that Reinert's actions in February and March of 1994 in enabling BVBS and its subsidiaries to forge a forbearance agreement with Integra, detailed above, compel the conclusion that **Reinert** qualified as an insider of BVBS.

FCIC and the trustee argue that, under the rationale of *Papercraft*, Dressel derivatively qualifies as an insider of BVBS and

**2.** Reinert is president and sole shareholder of Dressel and, as such, qualified as an insider of   **Dressel.**

that it breached its fiduciary duty to BVBS and its creditors when it purchased Integra's secured claim for only forty-three percent (43%) of its face value. Accordingly, they continue, Dressel's secured claim should be reduced to the amount that it paid for it—i.e., $1,850,000.00.

This argument is without merit. Reinert does **not** qualify as an insider of BVBS by virtue of his above-described involvement in the affairs of BVBS.

Section 101(31)(B)(i), (ii), and (iii) do **not** apply here. Reinert was never a director or an officer of BVBS. In addition, he never was "in control of BVBS", notwithstanding his active involvement in enabling it to reach a forbearance agreement with Integra. At no time did he determine or influence the manner in which BVBS conducted its business affairs. For instance, he never determined what jobs BVBS bid on and never determined who worked for BVBS or himself paid its employees. The decision to negotiate and reach an agreement with Integra was made by Sacco. Reinert served as a facilitator, not as the driving force, in these matters.

Section 101(31)(B)(b)(iv) and (v) are not applicable. BVBS neither belonged to a partnership nor consisted of a general partnership of which Reinert was a member.

Finally, § 101(31)(B)(vi) does not apply. Reinert was not a "relative" of any general partner, director, officer, or person in control of BVBS.

Reinert's extensive involvement, as detailed above, does **not** compel the conclusion that his relationship with BVBS was "sufficiently close" to warrant subjecting his actions vis-a-vis BVBS to closer scrutiny than the actions of anyone who dealt with BVBS on an arm's length basis.

Reinert understood that if Integra took action against the assets of BVBS and its subsidiaries that he would receive nothing in repayment of the substantial sums he previously had loaned to Sacco. He interceded on behalf of BVBS in the negotiations with Integra in the hope that an accommodation might be reached whereby the money he had loaned to Sacco would yet be repaid.

The argument that Dressel's claim should be reduced because Dressel qualified as an insider of BVBS and because Dressel violated its fiduciary duty to debtor's estate when it purchased Integra's prepetition secured claim at a discount fails in light of the determination that Reinert was **not** an insider of BVBS. Dressel had no involvement in the affairs of BVBS and owed no fiduciary duty to debtor's estate. It was under no obligation to refrain from purchasing for itself Integra's secured claim at a discount.[3]

The outcome would be no different in this instance even if Reinert had controlled the affairs of BVBS and thereby qualified as an insider who had a fiduciary duty to debtor. Given the circumstances presented in this case, Reinert did **not** violate any fiduciary duty he had when he purchased Integra's lien on behalf of Dressel for $1,850,000.00.

■ An insider of a corporation may seize a business opportunity of a corporation of which they are an insider when the corporation is incapable of taking advantage of that opportunity for itself. *See In re Gailey,* 119 B.R. 504, 514 (Bankr.W.D.Pa.1990) (*citing Robinson v. Brier,* 412 Pa. 255, 257, 194 A.2d 204, 206 (1963)). BVBS was in desperate financial straits in June of 1994 and was totally incapable of purchasing Integra's lien even at a 57% discount. Reinert, as an alleged insider of BVBS, undoubtedly had no obligation to purchase the lien with his own funds on behalf of BVBS. We know of no cases that **require** an insider, who has the wherewithal, to lend money to the corporation so that it may avail itself of such an opportunity.

Rejection of the contention that the amount of Dressel's interest in debtor's prop-

---

**3.** As an alternative to their argument based on *Papercraft,* FCIC and the trustee have argued at great length in their post-hearing brief that the amount of Dressel's lien in excess of $1,850,-000.00 should be equitably subordinated pursuant to 11 U.S.C. § 510(c)(1). We shall not address this contention here because it was not raised at the hearing and because such a matter must be brought as an adversary proceeding. *See* Federal Rule of Bankruptcy Procedure 7001(8).

erty should be reduced to $1,850,000.00 does not necessarily mean that the value of its interest is $4,232,600.67.

As was indicated, Dressel thus far has recouped the sum of $583,500.00 by selling to third parties personal property that it had purchased at various sheriffs' sales by bidding its costs.[4] In addition, Dressel (or Reinert) has purchased at sheriffs' sales real property subject to its lien for $816,000.00 and $40,000.00, respectively. The total value Dressel has realized from these transactions is $1,439,550.00 ($583,550.00 + $816,000.00 + $40,000.00 = $1,439,550.00).

Dressel's lien accordingly must be reduced by at least this amount to $2,793,050.67 ($4,232,600.67 − $1,439,550.00 = $2,793,-050.67). The outstanding amount of its lien **may** be even less. It cannot be determined, for instance, whether all of the assets subject to the lien have been sold to third parties. To the extent they have not, the amount of the lien should be reduced accordingly by the value of this unsold collateral.

### B) *Is There Equity?*

Having determined the maximum amount of Dressel's lien, we must determine next whether it is entitled to relief from the automatic stay.

Section 362 of the Bankruptcy Code provides in pertinent part as follows:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of the section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property under subsection (a) of this section; if—

(A) the debtor does not have any equity in such property; and

(B) such property is not necessary to an effective reorganization....

11 U.S.C. § 362.

It is undisputed that the property from which Dressel seeks to have the automatic stay lifted is not necessary to an effective reorganization. BVBS is in a chapter 7 proceeding and therefore does not contemplate reorganizing.

What remains to be determined is whether there is any equity in the property that is subject to Dressel's lien. If there is none, Dressel is entitled to relief pursuant to § 362(d)(2).

For purposes of § 362(d)(1) and (2), "equity" is the difference between the value of the property subject to liens and encumbrances and the amount of those liens and encumbrances. *See Matter of Sutton,* 904 F.2d 327, 329 (5th Cir.1990).

■ The burden of proof with respect to the question of equity is upon Dressel as the moving party. Section 362 of the Code provides in relevant part as follows:

(g) in a hearing under subsection (d) or (e) of this section concerning relief from the stay of an act under subsection (a) of this section—

(1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and

(2) the party opposing such relief has the burden of proof on all other issues.

11 U.S.C. § 362.

■ Dressel has **not** met its burden of proof in this regard.

Dressel's lien attaches not only to the assets of BVBS but also to the assets of Atlantic, Eastern, Concrete, and Lucianni. The value of the assets of these subsidiaries also must be taken into consideration when determining whether there is equity in the assets subject to Dressel's lien. Were it otherwise, an overzealous lienholder might under certain circumstances obtain relief from the automatic stay where it would be inappropriate.

Assume, for instance, that A, B, and C all are in bankruptcy; that the value of the

---

**4.** The amount of Dressel's costs are not of record but presumably are relatively negligible.

assets of A, B, and C is less **taken individually** than the amount of D's lien; and that the value of their assets **taken collectively** exceeds the amount of D's lien.

If the value of A's, B's, and C's assets are considered in isolation; and if D were to proceed against only A's assets, and then against only B's assets, and finally against C's assets, D would be entitled to relief from the automatic stay with respect to all three debtors even though the **combined** value of their assets exceeds the amount of D's lien.

Under this scenario, D would be able to take action against the assets of all three debtors even though they collectively have equity therein. Any equity that exists may not be available for distribution to other creditors. Such an outcome is not in keeping with one of the fundamental tenets of bankruptcy.

We previously determined that the amount of Dressel's lien, after accounting for the extent to which its interest had been partially satisfied by the amounts Dressel realized from the resale of personalty to third parties and the price paid in purchasing a parcel of real property, is at most $2,793,050.67. Accordingly, for Dressel to prevail under § 362(d)(2), it must establish that the value of the assets belonging to BVBS and to its subsidiaries is equal to or less than this amount. Failure to establish this will result in denial of its motion for relief from the automatic stay.

Dressel has established that the value of debtor's real property is $844,000.00. Testimony offered by one of its witnesses also established that a portion of debtor's machinery, equipment, and vehicles has a value of $630,000.00. It was disclosed at the hearing that an account under the trustee's control contains $110,000.00 and that the remaining insurance policy on the life of Gabriel Sacco has a cash surrender value of $6,000.00.

The total value of these assets is $1,590,000.00. Were these the only assets to be considered, we would be confident in concluding that there is no equity in the property subject to Dressel's lien. The amount of its lien would exceed the value of the collateral

subject thereto by $1,203,650.67 ($2,793,050.67 − $1,590,000.00 = $1,203,050.67).

However, we have determined that the assets of BVBS are not the only assets that must be taken into consideration. The value of any assets of Atlantic, Eastern, Concrete, and Lucianni that have not been levied upon and sold at sheriffs' sales must also be taken into account.

Dressel offered no evidence indicating either that it already has executed against all of the assets of Atlantic, Eastern, Concrete, and Lucianni or (if it has not) what the collective value of their remaining assets is. Absent such a showing, we are not confident that there is no equity remaining in the collateral subject to Dressel's lien.

BVBS and its subsidiaries submitted several audited consolidated financial statements to Integra during negotiations to reach a forbearance agreement. If taken at face value, these statements indicate that the assets of debtor's subsidiaries may have an aggregate value of approximately $1,250,000.00. Dressel offered nothing to show that these value were grossly exaggerated or are no longer accurate. In addition, Dressel did not offer anything to indicate what portion of these assets were purchased at sheriffs' sales. Given the state of the record created by the parties, we can only speculate about these matters.

We also are not confident that the totality of BVBS' equipment, machinery, and vehicles is worth only $630,000.00, as Dressel claims. Our uncertainty stems from the fact that equipment, machinery, and vehicles bearing the logo of BVBS have operated under the direction of Gabriel Sacco at a highway construction site since the filing of the involuntary bankruptcy petition and entry of the order for relief.

As far as we can determine, these assets may not have been included in the appraisal offered by Dressel in support of its motion for relief from the automatic stay. The witness called by Dressel who testified as to the value of BVBS' vehicles and machinery was not certain that he had appraised **all** of its vehicles and machinery. Moreover, the circumstances surrounding their use leads us to

wonder whether they are assets of BVBS or one of its subsidiaries. If they are, we are left to question whether their value, when combined with the value of debtor's other assets or the assets of its subsidiaries, exceeds the amount of Dressel's claim.

In other words, there **may** be equity in the assets subject to Dressel's lien. Dressel has not shown to our satisfaction that there is no equity. Acting out of an abundance of caution, we are convinced that the most appropriate course of action is to preserve the status quo and to deny Dressel's motion.

One final matter should be touched upon.

The prevailing rule is that **all** valid liens and encumbrances must be considered when determining whether there is equity in property for purposes of § 362(d)(2). *See Stewart v. Gurley*, 745 F.2d 1194, 1195–96 (9th Cir.1984).

We considered only the amount of Dressel's lien in arriving at the conclusion that its motion for relief from the automatic stay should be denied. Even though FCIC also has an apparently valid subordinate lien in the approximate amount of $3,500,000.00, we gave no consideration to the amount of its lien in denying Dressel's motion. The outcome is not different even when we consider the amount of FCIC's lien (as well as the amount of any other subordinate liens).

Two issues must be addressed when determining whether there is equity in property for purposes of § 362(d)(2):

(1) the value of the subject property; and

(2) the amount of debt encumbering the property.

*See Estate Construction Co. v. Miller & Smith Holding Co., Inc.*, 14 F.3d 213, 219 (4th Cir.1994). The automatic stay may be lifted if the latter is greater than or equal to the former. *Id.*

Dressel's motion will be denied because it did not come forward with evidence as to the value of **all** the encumbered property. It offered evidence as to only a portion. As a result, we had no basis for determining the difference between the combined value of all subject property and the value of all attaching liens and encumbrances. Taking into account the amount of FCIC's subordinate lien does not bring us any closer to determining the total value of all property that is subject to these liens, as we must do when determining the issue of equity. We cannot determine whether one number is greater than or equal to another unless we have some idea as to the value of each.